RANSBURG ELECTRO–COATING
CORP., a Corporation,
Plaintiff,

v.

NORDSON CORPORATION, a Corporation, Defendant.

Civ. A. No. 65 C 1195.

United States District Court
N. D. Illinois, E. D.

June 14, 1968.

Hume, Clement, Hume and Lee, Chicago, Ill., for plaintiff.

Hibben, Noyes & Bicknell, Chicago, Ill., for defendant.

AUSTIN, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW*
### PARTIES, PLEADINGS AND ISSUES

1. Plaintiff, Ransburg Electro-Coating Corp., is a corporation incorporated under the laws of the State of Indiana and has its principal office and place of business at 3939 West 56th Street, Indianapolis, Indiana. (Amended Complaint para. II, and Amended Answer para. 2.)

2. Defendant, Nordson Corporation, is a corporation incorporated under the laws of the State of Ohio, having its principal office and place of business at Amherst, Ohio, and a regular and established place of business at 5350 McDermott Drive, Berkeley, Illinois, within this district. (Amended Complaint para. III, and Amended Answer para. 3).

3. This action arises under the patent laws of the United States, 35 U.S.C. Sections 271, 281 et seq. (Amended Complaint para. I, and Amended Answer para. 1.) The following United States Letters Patent, all owned by plaintiff, are involved:

| Patent No. | Inventor | Date |
|---|---|---|
| 3,048,498 | J. W. Juvinall & J. C. Marsh | August 7, 1962 |
| 3,169,882 | J. W. Juvinall, E. Kock & J. C. Marsh | February 16, 1965 |
| 3,169,883 | J. W. Juvinall | February 16, 1965 |

Defendant is charged with directly infringing all the above patents and additionally with actively inducing and contributing to, infringement by others. (Amended Complaint paras. IV–XIV incl.)

4. Acts of defendant complained of by plaintiff as infringements with respect to each patent in suit, including actively inducing infringement and contributing to infringement, have been committed in this district and elsewhere subsequent to the issue date of each patent in suit.

5. The original complaint herein filed on July 16, 1965 named as defendants Nordson Midwestern, Inc. and Marvel Metal Products Co., alleged infringement of United States Letters Patent Nos. 3,048,498, 3,169,882, and 3,169,883 and prayed for injunctive relief and for damages together with costs. The original complaint was dismissed against defendant Marvel Metal Products Co. after it took a license under the patents in suit. Nordson Midwestern, Inc., the original defendant was a sales

---

* The following symbols will be used hereinafter in documenting the Findings to the evidence:
   Tr.—trial transcript
   PX—plaintiff's exhibit
   DX—defendant's exhibit
   RA—admissions of defendant
   PI—plaintiff's interrogatories and defendant's answers thereto
   para.—paragraph.

affiliate of the present defendant, Nordson Corporation. By stipulation between the parties, approved December 21, 1966, Nordson Corporation was substituted for, and in all respects stands in the place of, Nordson Midwestern, Inc. as party defendant.

6. On October 28, 1967, plaintiff, with leave of court, filed an amended complaint naming as defendant Nordson Corporation and alleging infringement of United States Letters Patents Nos. 3,048,498, 3,169,882 and 3,169,883 and praying for injunctive relief and for damages together with costs. Defendant answered the amended complaint on December 5, 1967 denying validity and infringement and asserted that the patents are not enforceable under theories of laches, fraud in the procurement of the patents, and patent misuse. Defendant also filed a counter-claim seeking a declaratory judgment of invalidity and non-infringement and non-enforceability of the patents asserted by the plaintiff.

7. The trial of the case began January 2, 1968, continued for sixteen days, and concluded January 23, 1968. At the beginning of the trial demonstrations were conducted which included the spray coating of articles by prior art methods and apparatus, by commercial methods and apparatus (Tr. 132–160). Both methods and apparatus of plaintiff embodying the inventions of the patents in suit and accused methods and apparatus of the defendant which are being currently marketed and are charged to be infringed, were demonstrated (Tr. 161–186). Both plaintiff and defendant conducted exhaustive pretrial discovery. At the trial plaintiff had three live witnesses (Tr. 189, 2542 and 2742) and relied on the testimony of nineteen deposition witnesses (2617, 3202–3257), and defendant had six live witnesses (1078, 1099, 1115, 1238, 1808 and 2446) and relied on the testimony of ten deposition witnesses (Tr. 1032, 1133, 1204, 1265, 1475, 1493, 1524, 1636, 1754, 2337 and 2422).

## BACKGROUND OF THE INVENTIONS

### Nonelectrostatic Spray Guns

8. Prior to 1944, substantially all industrial spray painting was accomplished by non-electrostatic air-spray guns where a small stream of paint forced through an orifice was hit by one or more high-velocity jets of compressed air which both atomized the paint and directed the atomized particles toward the work (article to be painted) (Tr. 200).

9. The principal type of non-electrostatic air-spray gun used prior to 1944 was a metallic gun held in the hand and manipulated by a workman to coat an article. Such a gun is commonly referred to as a "hand gun". Guns were also marketed that were mechanically supported in spaced relation to a conveyor so that articles carried by the conveyor would move past the gun and be painted by the spray emanating from it. Such guns were referred to as "automatic guns". (Tr. 200.)

10. Spray painting with such air-spray guns provided a high quality finish and permitted a reduction in labor costs over conventional hand painting techniques such as with the use of a brush, but spray painting was extremely wasteful of paint. Much of the paint sprayed, rather than being deposited on the work, was carried past the work and lost as "overspray". The term "overspray" describes that portion of the paint sprayed which is not deposited on the surface of the work. Overspray represents a serious waste of paint, is a health hazard, and usually requires the use of relatively expensive overspray collecting equipment to prevent contamination of the factory area. In spraying certain articles with these air-spray guns, as much as 75% of the paint is lost as overspray. (Tr. 133–145.)

### Early Development of Electrostatic Spray Painting

11. The large waste of coating material associated with air-spray guns and resulting from "overspray" encouraged the search for spray painting systems

which would deposit a greater percentage of the total paint sprayed on the article (the percentage of sprayed paint which is deposited on an article is called "transfer efficiency"). Those working in the art of spray coating concluded that if the particles of paint could be attracted to the article rather than being projected toward or in the direction of the article, the amount of overspray would be substantially reduced. Thus it was determined that the electrostatic attraction phenomena might be advantageously employed in spray painting. By imparting an electrical charge to the spray particles, these particles would be electrostatically attracted to the grounded article to be painted. At least some of the particles that would otherwise be lost in overspray would be deposited on the article and the transfer efficiency of the overall system would be enhanced (Tr. 202–203).

*Plaintiff Ransburg*

12. The first commercial electrostatic spray painting system was pioneered by Harper J. Ransburg Company, a partnership, and plaintiff's predecessor in the electrostatic spray painting business. The partnership, consisting of Harper J. Ransburg and his three sons, was engaged in the production and sale of kitchen cannisters and other housewares which were spray painted by conventional air-spray guns. Concerned over the large waste of paint in the use of conventional non-electrostatic air spray painting equipment, Harold Ransburg, one of the sons, turned his attention to the reduction of that waste. The outcome of his inventive efforts was the first commercially successfully, automatic electrostatic spray coating process, which is known as the "Ransburg No. 1 Process". (Tr. 140–148, 190–204.)

13. The No. 1 Process, which was introduced commercially in the mid 1940s, employed compressed-air spray guns for spraying paint into an electrostatic field maintained between conveyorized articles and an electrode, comprising an open-ended, fire-wire, cage-like grid structure. Entering the field, the paint particles were electrically charged by bombardment with ions emanating from electrode wires and were urged toward deposition by the effect of the field (Tr. 194–197). The effect of electrostatic forces in reducing overspray loss is manifest not only in actual paint savings, but also by the presence of deposited paint on article surfaces which do not face the gun. This characteristic of electrostatic spray painting is called "Wrap around". (PX 484A, 487; RA 248–251, incl.; Tr. 156–157.)

The No. 1 Process substantially reduced paint losses as compared with the conventional, non-electrostatic air spray system. However, there were still significant paint losses, especially in painting open articles such as tubular metal chair frames and automobile steering wheels (Tr. 145).

14. Ransburg's continued efforts in the electrostatic painting field culminated in another invention, namely the "No. 2 Process". This process entirely eliminated the paint-wasting air blast and, in many applications, almost 100 percent transfer efficiency was attained (Tr. 207–208). One commercial form of the No. 2 Process was an automatic system utilizing a rotating, electrically charged paint atomizer or "head" of bell-like form on the inner surface of which the paint was distributed as a film. An electrostatic field was established between the atomizer and the work. Such field atomized the paint at the bell edge, highly charged the paint and deposited it on the work. (Tr. 207–210.)

15. Both the No. 1 Process and the No. 2 Process found extensive use in industry, but each had certain limitations (Tr. 247). The No. 1 Process still wasted much paint in the coating of some types of articles (Tr. 145). The No. 2 Process was not adapted for the use of some paints (Tr. 224), and it did not provide adequate coating in deep recesses (Tr. 157, 212). The high voltages, up to 100,000 volts, used in both systems created a hazard both with respect to operating personnel and with respect to

possible fire or explosion. Commercial spray painting often involves the use of highly volatile solvents whose vapors may be flammable in air. Sparks from electrostatic painting apparatus may release enough energy to ignite paint or paint vapor. The achievement of safety thus became one of the goals in the further development of electrostatic painting. (Tr. 158–161, 245–246.)

*Other Major Companies*

16. Starting in the 1940's, after introduction of the Ransburg No. 1 Process, several of the country's largest technically oriented companies pursued research and development in the electrostatic painting art. Ford Motor Co., General Motors Corporation, General Electric Company, and the DeVilbiss Co. were some of the companies that were seeking answers to the perplexing problems in this art. (PX 559, 560, 563, 566, 567, 571; Tr. 1032–77, 1265–1492.) Help from professional research organizations was also sought. (PX 567, Burnside, pp. 31–36, 44–45, 48–53, 63–69, 71–75; PX 571, Slatkin, pp. 41–45; PX's 262–265, 267, 268, 270–278, 280, 283, 286, 288–295, 297, 298, 305 and 306; PX 564, Simpkins, p. 13; PX 565, Otto, p. 32.)

*Ford Motor Company*

17. Because the proper painting of automobile parts is of great importance, the largest automobile manufacturers were among the first to develop an interest in electrostatic painting equipment (PX's 559, 560, 566, 567, 571; Tr. 1493–1518). The early efforts of Ford Motor Company in this regard were directed toward an electrostatic atomization system simulating the Ransburg No. 2 Process and utilizing charged, rotating cup-like atomizing heads. Ford also experimented with an electrostatic painting system utilizing an atomizer in which paint was forced through an orifice under very high pressure. This type of pressure atomization is normally referred to as hydraulic or hydrostatic atomization. In order to charge the paint, Ford's engineers employed a plurality of charged electrodes. (PX 566, Stueckle, pp. 8–9, 11, 15–16; PX 567, Burnside, pp. 18–21; PX 571, Slatkin, pp. 13–24, 33–34, PX's 235, 244 and 255; DX 193.)

18. One form of hydrostatic spray device sought to be patented by Ford is shown in Australian Patent 211,044 (DX 179). In the illustrated device, it was intended that the paint be forced through a nozzle orifice and atomized under the influence of hydrostatic pressure. A plurality of charging electrodes are shown for effecting electrostatically charging of the atomized paint. A device of this general type, including twenty-eight charging electrodes surrounding the orifice, was experimented with at Ford in approximately 1955 (PX 235, 244 and 255); however, it was never used commercially. (PX 566, Stueckle, pp. 9, 11, 12, 20, 22, 23; PX 567, Burnside, pp. 88–89.)

After several years of its own development efforts in electrostatic spray painting, Ford engaged the Engineering Research Institute of the University of Michigan to assist in the development of a high pressure paint atomizing system for industrial finishing (PX 262, 263; PX 571, Slatkin, p. 43). In spite of several years of work by Ford and the University of Michigan from 1955 through 1958, this effort to develop a finishing system was finally abandoned. (PX 306, 308; PX 567, Burnside, pp. 84–89.)

Ford's efforts to produce an acceptable hydrostatic electrostatic spray painting device in the middle 1950's and its failure to do so despite its rather intensive development efforts are particularly significant. At or about the time that Ford initiated its work on a hydrostatic-electrostatic system, it was cognizant of its potential liability to Ransburg as a result of its use of a simulation of the Ransburg No. 2 Process. Accordingly, the corporate policy at Ford was to pursue a development effort which would yield an electrostatic spray coating system that would not be charged to be an infringement of the

Ransburg No. 2 Process patents not here at issue (PX 281A, B and C). When the efforts with respect to a hydrostatic-electrostatic system did not yield a commercial system, Ford went forward with its simulated No. 2 Process approach and was ultimately found to have infringed the Ransburg No. 2 Process patents. (Tr. 2789; Ransburg Electro-Coating Corp. v. Ford Motor Company, D.C., 245 F.Supp. 308.) Ford is now a Ransburg licensee under these patents (Tr. 2789).

*General Motors Corporation*

19. General Motors was also actively interested in electrostatic spray painting. Prior to 1947 it was licensed by Ransburg to use the No. 1 Process. (PX 559, Lamm, p. 5.)

Prior to 1950 technical personnel from the Ternstedt Division of General Motors and from General Motors Research began to develop a spray coating system that would be as free of fire hazards and as efficient as possible (PX 559, Lamm, p. 5). General Motors technical personnel involved in brainstorming this development included Dr. Edward Martin of the Research Laboratory, Cleve Nixon, Director of Process Development for Ternstedt, Dr. C. Durward Tuttle, and Mr. Larson of the Ternstedt Division and Mr. Lewis J. Lamm (PX 559, Lamm, pp. 6–8). As a part of this effort in 1949 General Motors filed a patent application on an electrostatic painting system in which a diesel fuel nozzle was used to atomize the paint (DX 230, PX 312). The paint charging mechanism comprised a plurality of charged, pointed electrodes arranged somewhat like the spokes of a hubless wheel. Paint was projected from the grounded nozzle through the hub area toward the article and thus past the inner extremities of the pointed electrodes (PX 559, pp. 7, 19 and 20; PX 312). This apparatus was never used for painting in any General Motors plant (PX 559, pp. 12 and 19).

The result of this work was the so-called Ternspray device. This device consisted of a charging mechanism including a plurality of pointed electrodes positioned well in front of and to one side of a conventional grounded air spray gun. The electrodes were directed toward a grounded plate and transversely of the spray projected from the gun (PX 559, Lamm, p. 5; PX 310). The Ternspray apparatus was used at General Motors (PX 559, Lamm, p. 10) in spite of the fact that paint had to be periodically cleaned from the charging needles to avoid the detrimental effects of blobs of paint detearing off the end of the needles onto the article being painted (PX 559, Lamm, pp. 16 and 17; PX 315, p. 58).

Beginning in 1949 the Process Development Section of General Motors Research Laboratory started a project to improve the Ternstedt spray process and to adapt it to all possible painting activities at General Motors (PX 560, Gardner, p. 6). During this project, attempts were made to substitute a non-pneumatic, hydraulic atomizing device for the air spray gun (PX 560, Gardner, pp. 9, 13; PX 314). Emphasis upon development by the Process Development Section, however, was given the Ternspray device and electrostatic atomizers rather than the non-pneumatic high pressure electrostatic process because at that stage both processes were acceptable and satisfactory in production while the non-pneumatic process was not satisfactory (PX 560, Gardner, pp. 22 and 23).

As late as 1961 General Motors was still experimenting with high pressure non-pneumatic atomizing nozzles in electrostatic painting systems (PX 559, Lamm, pp. 11–13; PX 311).

In spite of its efforts General Motors failed to develop a truly efficient electrostatic spray painting system using mechanical atomization and free of the deleterious effects of paint collecting upon the array of pointed charging electrodes.

**454**

*The DeVilbiss Company*

20. In th late 1930's, during the developmental stage of the No. 1 Process, Harold Ransburg gave a demonstration of electrostatic painting to the DeVilbiss Company of Toledo, Ohio, a leading manufacturer of non-electrostatic spray painting equipment (PX 563, Peeps, p. 5; Tr. 1070–1072). Thereafter, DeVilbiss supplied Ransburg with conventional air-spray apparatus for use in Ransburg's electrostatic systems (Tr. 1073–1074).

21. Later, in 1941 and 1942, DeVilbiss and Slayter Electronics Corporation (later a division of Owens-Corning Fiberglas) undertook a joint effort directed toward the development of electrostatic, air-atomizing spray coating equipment (PX 563, Peeps, pp. 5–17; PX 564, Simpkins, pp. 10–27; PX 565, Otto, pp. 10–12). Initially, that effort involved experiments with an electrically charged, all metal, air atomizing spray gun disclosed by Bennett and Taylor in their U.S. Patent 2,491,889 (DX 141; PX 395) and their abandoned patent application Serial No. 427,638 (DX 142; PX 396; PX's 317, p. 1, 321, PX 565, Otto, p. 10). These experiments proved the so-called "Bennett" gun unsatisfactory for spray painting (PX 563, Peeps, p. 16; PX 565, Otto, pp. 25, 27). Modified guns, which were intended to improve the charging characteristics by employing supplementary charging electrodes, were built and tested (PX 563, Peeps, pp. 16, 24; PX 565, Otto, pp. 17, 25–28). The modified guns also proved unsatisfactory (PX 563, Peeps, pp. 25–29; PX 565, Otto, pp. 30–32).

22. Although the Slayter (Owens-Corning) group abandoned its efforts, DeVilbiss continued (PX 563, Peeps, 29). After independently pursuing this matter, DeVilbiss entered into a joint development effort with the General Electric Company in early 1944 (PX 563, Peeps, 30). This joint effort with General Electric continued for some six years (PX 563, Peeps, 30–59). DeVilbiss' efforts with Slayter and General Electric resulted in a spraying apparatus of the type shown in Patent 2,625,590 (PX 215, PX 364; PX 563, Peeps, 29). This patent was issued to D. J. Peeps, the DeVilbiss engineering executive principally responsible for its electrostatic spray painting activities.

23. DeVilbiss renewed its activity in electrostatic painting in the early part of 1960 by marketing electrostatic painting apparatus of Japanese origin (PX 563, Peeps 59–60). DeVilbiss stopped marketing this equipment in 1963 or 1964 (Tr. 1075, 1076). About this time, DeVilbiss hired several former research and development employees of Ransburg, including the inventors named in the patents in suit. It was only thereafter, and some 25 years after its initial exposure to Ransburg's electrostatic painting systems, that DeVilbiss produced and marketed electrostatic spray painting equipment of its own design (PX 563, Peeps, pp. 73–74, 78; Tr. 1077).

24. Mr. Peeps, although a prolific inventor and the holder of some 40 patents, was unable to produce for DeVilbiss, a commercially acceptable electrostatic spray painting system in spite of assistance from General Electric (PX 563, Peeps, p. 59; Tr. 1077).

EARLY DEVELOPMENT OF HAND HELD EQUIPMENT

25. Before the inventions of the patents in suit, all commercial electrostatic spray painting installations were "automatic" systems in which articles to be painted were moved in a conveyor past mechanically supported electrostatic spray charging devices (Tr. 158, 202–204, 211–216, 318–319). Since the electrostatic automatic systems did not require close attendance of operating personnel and the electrostatic equipment could be shut off manually or automatically if an operator need to approach the apparatus, the existence of a shock hazard was normally not of great concern (Tr. 158–159). Nevertheless there was a safety hazard in that an article on the conveyor might, as a result of swinging or improper positioning, approach the electrode so closely as to cause

a dangerous spark (Tr. 159–160). An acceptable degree of safety was achieved with automatic systems by designing commercial installations so that the distance between the high voltage electrode and the articles to be coated was much greater than the distance at which the sparking would occur (Tr. 245–247) and by providing a switching device which turned off the voltage in the event of a spark (PX 574, tab 12). Installations were often caged in order to put the spray area "off-limits" (DX 206).

26. Several factors made the achievement of safety considerably more difficult with hand guns. One factor was the necessity of making a hand gun readily manipulable. Another was the wide variations in spacing between the charged gun and the grounded article being coated that necessarily occurred when using a hand gun (Tr. 292–295). A third factor was the greatly increased possibility of injury to an operator from inadvertently touching the portion of the hand gun at high voltage. Both of the latter two factors greatly increased the likelihood of sparks in the presence of flammable vapors. (Tr. 245–247; PX 138).

27. Early attempts to make a safe electrostatic painting system using a hand spray gun took several forms, none of which ever became commercial (Tr. 318, 319). In some forms sparks and shocks were to be prevented by mechanically limiting the ability of a man to approach a high voltage electrode or limiting the ability of a high voltage electrode to approach an article or other grounded object (Tr. 2639–2641). One of the earliest proposals for a safe hand gun system employed mechanical restraints on the operator and on the gun, and is illustrated in Harold Ransburg's Patent 2,546,701 filed in 1944. This mechanism was never used because it proved incapable of preventing sparks under all conditions and manipulation of the gun was too restricted. (PX 423; Tr. 319–321.)

Other early forms of hand gun systems attempted to prevent sparks by using an electronic circuit which would act in response to electrical changes occurring within the system immediately prior to a spark to turn off the voltage source before a spark could occur (PX 574, tab 12). These expedients all proved to be impractical in hand gun systems. While they could turn off or reduce the supply of the electrical energy to the portion of the gun at high voltage, they could not prevent the instantaneous and dangerous discharge of the energy stored on the high voltage portion during normal operation. (PX 138, col. 5, lines 10–14.)

## THE INVENTIONS OF THE PATENTS IN SUIT

*Patent No. 3,048,498*

28. Patent 3,048,498 (PX 138) is directed toward a method and apparatus for efficiently and safely depositing paint that is atomized either mechanically or electrostatically. The patent discloses the incorporation of the invention into hand-held and automatic painting systems. The patent further discloses that the intensity of the electrical discharge ultimately obtained from a paint charging electrode in such a system is determined by the electrode size, the electrical conductivity of the electrode material and the electrode shape (particularly as to "sharpness" or "bluntness"). The patent defines these electrode characteristics collectively by the phrase "effective capacity". (Tr. 325–328; PX 138, col. 4, lines 50–75 and col. 5, 1. 1–2.) The patent discloses that the danger of fire or explosion in an electrostatic painting operation varies with the type of paint being used, the paint solvent, and the temperature. The patent teaches how a paint charging electrode with an effective capacity of the proper value, a high resistance having the proper location and value, and a high voltage source with the proper output voltage characteristics can be combined to electrostatically paint safely under differing operating conditions. Such a combination makes possible variations of electrode-to-article spacing while main-

taining the potential gradient of the electrostatic field at values consistent with high transfer efficiencies but still below values at which objectionable sparking occurs. The claims of the patent define methods and apparatus for electrostatically spray painting safely for a variety of operating conditions. (Tr. 284–287, 291–298, 313–318, 325–332, 2291.)

The '498 patent teaches that the "effective capacity" of a paint charging electrode can be measured by comparing the energy of its electrical discharge to the energy of the electrical discharge of polished metal spheres of different diameters. The '498 patent sets forth a test for measuring the "effective capacity" of an electrode in an electrostatic system by such a comparison. The claims of the '498 patent that refer to the "effective capacity" of a charging electrode are definite since they define the value of "effective capacity" in terms of that of metal sphere of either one centimeter radius or three centimeters radius. One skilled in the art of electrostatic spray painting, by using the teaching of the '498 patent, can readily determine the "effective capacity" of a charging electrode of a given electrostatic painting system and can determine if the painting system falls within the claims of the '498 patent.

The invention of the '498 patent was completed by October, 1954. (DX 7–1; DX 139, pp. 86–87; DX 140; Tr. 2623–2641.) The invention of the '498 patent was incorporated by Ransburg into its commercial devices known as the No. 2 Process hand gun, the R-E-A (air atomizing) and the R-E-H (hydrostatic atomizing) electrostatic guns. (Tr. 2733–2737.)

*Patent No. 3,169,882*

29. Patent 3,169,882 (PX 139) is directed toward improving transfer efficiency by increasing the charge impressed on the particles of mechanically atomized paint as by compressed air or hydrostatic pressure, and it is capable of projecting paint into recesses and

atomizing a wider range of paints than can be handled in the No. 2 Process. The specific embodiments shown in the drawings of the '882 patent are air atomizing electrostatic spray guns.

The gun of the '882 patent carries at its front end a small elongated, wire-like, spray-charging electrode. Undesirable electrical shielding of the tip of the electrode is eliminated, by making at least the forward portion of the gun entirely of insulating material except for the electrode, thereby enhancing the filed concentration and ion production at the tip to produce at that location an extremely high potential gradient and a concentrated zone of ions. The paint spray particles are atomized and directed in such a way that they become highly charged by ion bombardment while passing through the concentrated zone of ions before the spray has expanded appreciably. Spray guns using this invention provided a highly effective way of charging paint particles which had been mechanically atomized (as by compressed air or hydrostatic pressure) and attained high transfer efficencies. The invention of the '882 patent was completed by October, 1957 (DX 8, Tr. 1790–1795). The invention described and claimed in the '882 patent is incorporated in both Ransburg's R-E-A and R-E-H guns.

*Patent No. 3,169,883*

30. Patent 3,169,883 (PX 140) is directed toward hydrostatic-electrostatic spray coating methods and apparatus. The inventions of this patent comtemplate the projection of paint from a highly charged nozzle in the form of a thin expanding film having a length (as measured from the nozzle orifice to the front edge of the film from which atomization takes place) of only a fraction of an inch. The paint so projected is both finely atomized and highly charged and forms a pattern eminently adapted for high speed production painting. A further aspect of the inventions of the '883 patent is the addition of an elongated wire-like electrode which is selectively oriented relative to the thin

expanding film emitting from the nozzle orifice so as to further enhance the transfer efficiency of the overall system. This electrode extends forwardly from the nozzle and is maintained closely adjacent to but spaced slightly from the liquid film and terminates adjacent the forward edge of the film. The increase in transfer efficiency that accompanied the inclusion of the projecting electrode in a hydrostatic-electrostatic system results from the concentration of the field at the optimum location in the proximity to particles being atomized from the film edge.

The invention of the basic hydrostatic-electrostatic system and method was completed by January 1953 (Tr. 2563–2579). After this high pressure electrostatic device had proven satisfactory, further development efforts were pursued which culminated in the invention defined in claims 5, 6, 7, 9, 12, 14 and 15 which was completed approximately December, 1957 (DX 107, p. 93; Tr. 1332–1340).

## THE PLAINTIFF'S COMMERCIAL EMBODIMENTS OF THE INVENTIONS

### The Ransburg No. 2 Process Hand Gun

31. The first commercial form of an electrostatic hand gun was Ransburg's No. 2 Process hand gun. This gun embodied the invention of the '498 patent. Marketing of this gun began in 1958. The atomizing bell of the No. 2 Process hand gun is made of insulating material and a resistive coating on its outside surface is a charging electrode of low effective capacity. This charging electrode is connected to a high voltage source through a closely adjacent resistor and a flexible cable. This connection is made within a barrel member made of non-conducting material. Paint is supplied to the inside surface of the bell and formed into a thin film at its edge by rotation of the bell. The electrostatic field between the charging electrode and the article being coated atomizes the paint into a charged spray. The charging electrode is sufficiently resistive to prevent an instantaneous discharge of all the energy from the electrode. The resistor is placed at the front of the barrel member adjacent to the charging electrode and a small wire is used to contact the charging electrode on the rotating bell to limit the amount of electrical energy stored on the connector between the electrode and the resistor. The No. 2 Process hand gun deposits almost 100% of the paint, is freely movable, and at the same time provides adequate safeguards against objectionable shocks to personnel and against sparks intense enough to cause fires or explosions. (Tr. 161–166, Tr. 2747; PX 536.)

### The Ransburg R-E-A Gun

32. The Ransburg R-E-A gun, an air atomizing electrostatic gun, which embodies the inventions of the '498 patent and the '882 patent, was first marketed in 1962 (PX 536). The R-E-A gun includes a paint atomizer formed of non-conductive material and a paint charging electrode of low effective capacity in the form of a thin wire carried by the atomizer. The charging electrode is connected to a high voltage source through a resistor located within a barrel member of insulating material. Paint is ejected from a small orifice in the atomizer at the front end of the barrel member of insulating material. Jets of compressed air form the paint into a spray, direct substantially all of it through a highly ionized zone formed by the end of the thin wire electrode, and shape the spray into an elongated pattern. The spray particles are highly charged by ion bombardment in passing through the highly ionized zone. An advantage of the R-E-A gun over the No. 2 Process hand gun is that the R-E-A gun can project the paint into recessed portions of an article. (Tr. 170–176, 526–536, 2736–2737; PX's 414, 534.)

### The Ransburg R-E-H Gun

33. The R-E-H gun embodies the inventions of the '498, '882 and '883 patents in suit. Paint is supplied to the R-E-H gun under high hydrostatic or hydraulic pressure and is projected through a noz-

zle with a very small opening which is constructed to form the paint into a thin expanding film with straight sides and having a length—between the nozzle orifice and the front edge of the film—of only a fraction of an inch. The paint is finely atomized from the front film edge by interaction with air. The gun incorporates a thin elongated electrode positioned adjacent the nozzle orifice and in a plane parallel to, but spaced from, the paint film and its front top portion terminates in proximity to the atomizing zone. The electrode is connected to a high voltage source through a multimegohm resistor. When the electrode is energized by the high voltage source and the gun is adjacent an article to be coated, an electrostatic field is established between the electrode and the article being coated. The portion of the field adjacent the front tip of the electrode has a high intensity gradient and it highly charges the atomized paint and deposits it on the article. Except for the electrode and the atomizing nozzle the gun is substantially entirely of insulating material, and the resistor immediately adjacent the electrode is encased in an insulating barrel of the gun. Because of the use of high pressure as a means for effecting atomization the amount of blow-by and bounce-back of atomized paint particles that occurs is reduced over that indicated in the operation of the R-E-A gun; however, the R-E-H gun is not as efficient as the Ransburg No. 2 Process gun. The R-E-H gun was first publicly displayed in 1962 and was introduced to the market in 1963. (Tr. 177–182; PX 533, Tr. 2734–2736; PX 558, Daly. p. 9; Tr. 2762, PX 536.)

## EVOLUTION OF DEFENDANT NORDSON'S INFRINGING DEVICES

*Westinghouse-Nordson Activities*

34. E. H. Griffiths, Jr., a graduate engineer was employed by the Westinghouse Headquarters Manufacturing Laboratory. This organization functioned to develop new equipment that would benefit the operating divisions of West-inghouse Electric Company. In mid 1955 Griffiths was placed in charge of investigating electrostatic painting for possible use by Westinghouse. (PX 557, Griffiths, pp. 13, 17, 18, 22.)

Impressed by Ransburg's demonstration of its No. 2 Process hand gun in which the spray man touched the charging electrode, Griffiths initiated work on a similar hand gun in 1959. Shortly after its start the objective of this project was changed to the development of an electrostatic hydrostatic hand gun. (Tr. 3211–3220.) This project continued at Westinghouse from 1959 through 1961. Henry E. Lehman, a graduate engineer employed by Westinghouse in June, 1959, also worked with Griffiths in trying to make the experimental gun safe. The first proposed Westinghouse electrostatic hydrostatic hand gun did not include a resistor adjacent the atomizing nozzle. (PX 562, Lehman, pp. 4–6.)

Westinghouse first tried to develop a special voltage supply in an effort to reduce the energy available at the front of the gun. The special voltage supply was to be used with the electrostatic hand gun being developed by Westinghouse and with the automatic painting installations of Westinghouse. (PX 562, Lehman, pp. 8, 9.) After discovering that such special voltage supplied would not answer its needs, Westinghouse began experimenting with resistors in the end of its high voltage cable adjacent the charging electrode. (PX 562, Lehman, p. 32.) In late 1960 after further work, it was discovered that resistance alone was not the answer and Lehman acquired and inspected a Ransburg No. 2 Process hand gun at the Westinghouse Laboratories. (PX 43–2; PX 562, Lehman, pp. 44–45, 52–54.)

Westinghouse next tried to prevent corona from the front of the gun by shrouding the spray nozzle with a conductive member having rounded smooth surfaces. Westinghouse subsequently abandoned the use of shrouds and used insulating materials for the nozzle's construction to reduce the intensity of

the electrical discharge at the front end of the gun. (PX 30; PX 31; PX 562, Lehman, pp. 47, 52–54, 69.)

35. Nordson Corporation supplied parts for prototypes of the Westinghouse electrostatic hydrostatic gun beginning in 1959 including handles and non-conductive barrel members. Samuel Rosen, Nordson's Chief Engineer, participated in the design of prototypes of the Westinghouse gun. Eric Nord kept himself informed of the development of the Westinghouse gun during the period from September 1959 until February 1962 (PX–484A RA 89, 95, 99).

36. Westinghouse Electric Company filed two patent applications upon its electrostatic-hydrostatic spray gun on March 8, 1962. One of these applications issued as a patent on April 19, 1966 to H. E. Lehman and E. H. Griffiths, Jr. This is U.S. Patent No. 3,246,844, entitled Electrostatic Painting Apparatus for Explosive Atmosphere. The other of these applications, Serial No. 178,478, was filed in the name of E. H. Griffiths, Jr., as sole inventor. This other application was abandoned and was succeeded by a continuation application, Serial No. 554,247, which was still pending in the U.S. Patent Office at the time of the trial. This latter application names H. E. Lehman and E. H. Griffiths, Jr., as joint inventors (PX 484A, RA 57, 58, 59.)

37. In September of 1961 Eric Nord, President of Nordson, confirmed the interest of Nordson in discussing a license to make, use and sell the Westinghouse hydrostatic electrostatic spray gun (PX 183). In October 1961, Kenneth H. Daly, Vice President of Nordson, informed Nordson's distributors and sales managers of the possibility that Nordson would have an airless electrostatic hand gun available for sale in two or three months (PX 484A, RA 82). In December of 1961 Daly contacted T. L. Bowes, General Patent Counsel for Westinghouse, as agent for Eric Nord in an attempt to obtain an exclusive license under the Westinghouse patent relating to the airless electrostatic hand gun. Eric Nord was interested in the protection it would afford to Nordson in making and selling this electrostatic equipment. (PX 484A, RA 84; PX 484C, RA 264; Tr. 3239–3241.) Westinghouse refused to grant an exclusive license to Nordson but offered them a non-exclusive license. The non-exclusive license was accepted by Nordson. (PX 186–1, PX 186–2.) Nordson has been licensed by Westinghouse since February 26, 1962 to use the inventions of U.S. Patent 3,246,844, abandoned Patent Application Serial No. 178,478 and its continuation application Serial No. 554,247 (PX 484A, RA 55–60). Nordson Corporation has paid Westinghouse in excess of $20,000 in royalties under this license agreement (PX 484A, RA 61).

*Defendant's Model A Gun*

38. Nordson's first commercial efforts under the license agreement involved the sale of a gun such as that shown in PX 27, the so-called Westinghouse gun (PX 484C, RA 270 and 271). Eric Nord and Sam Rosen began designing a shorter gun that was designated the Model A gun (PX 484C, RA 269; PX 570, Nord, p. 99). Although the barrel of the Model A gun was shorter than the barrel of the Westinghouse gun, the Model A gun used the inventions of the Westinghouse patent applications and was structurally similar to the Westinghouse gun. Nordson Model A series of guns included a hand gun, the pre-Versa automatic gun and the Versa automatic gun. The Model A guns all had barrel members made of insulating material and utilized an electrically charged spray nozzle. These guns all had a resistance adjacent the nozzle at the front end of the gun. As with the Westinghouse gun, a multi-megohm resistor was housed in a cartridge-cable assembly that was inserted into the barrel member and contacted a machine screw in providing the electrical connection to the spray nozzle. (PX 484A, RA 100, 107; PX 484C, RA 272–274; PX 570, Nord, pp. 96, 97; PX 27 and PX 89). A Model A Versa hand

gun was first sold to a Nordson sales subsidiary in June, 1962 (PX 484C, RA 289.)

39. In the first Model A hand gun sold by Nordson, the conductance of the paint in the paint passageway electrically connected the spray nozzle with the machine screw that projected into the paint passageway and served as a charging terminal in the passageway. (PX 484A, RA 110A.) By February, 1963 springs were placed in the paint passageway to form the electrical connection between the spray nozzle and the charging terminal (PX 484, RA, 117), but this made the guns less safe than the earlier guns in which the conductance of the paint was used to form the connection (PX 484A, RA 110B and 111). Nordson then tested "nozzle adaptor assemblies" including a teflon-graphite conductive sleeve to provide the electrical connection in the passageway between the spray nozzle and the charging terminal (PX 484A, RA 119). Model A guns were tested by determining the incendive or explosive characteristics of the guns with different values of resistance in the gun and the voltage supply, and with different teflon-graphite sleeves (PX 484A, RA 120). Eric Nord participated in these tests (PX 484A, RA 121–123). Starting April, 1963 all Model A electrostatic guns (hand and automatic) were equipped with nozzle adapter assemblies having a conductive sleeve to provide safer operation (PX 484A, RA 124; PX 106). Nordson continued its development of a resistive type electrical connection between the spray nozzle and the charging terminal (PX 484A, RA 125).

40. John Carney, a graduate engineer, was employed by Nordson in April, 1963 and worked in research and development of Nordson's products (PX 484A, RA 126 and 127). Part of Carney's duties were evaluating the safety features of the Nordson electrostatic guns (PX 484A, RA 128). Carney ran explosion tests and experimented with changes in the gun design in an effort to minimize the chance of a spark from igniting an explosive mixture of solvent and air (PX 484A, RA 129). Sam Rosen, Chief Engineer of Nordson, and Wilfred Swanker, a professional engineer licensed by the State of Ohio, worked with Carney on these tests (PX 561, Carney, p. 23).

41. Prior to the execution of the Westinghouse-Nordson license agreement, Nordson Corporation received a report dated October 19, 1961 on the new Ransburg electrostatic-air (R-E-A) Model No. 301E hand gun including a sketch of the gun and the power supply (PX 484A, RA 206; PX 55). In December, 1962, Nordson borrowed an R-E-A gun manufactured by plaintiff for distribution by Binks Mfg. Co., from Pittsburgh Spray Equipment Co., in Pittsburgh (PX 484A, RA 207). Employees of Nordson examined and tested the R-E-A gun in December, 1962 (PX 484A, RA 208). Sam Rosen, Frank Ziroe, Eric Nord, Wilfred Swanker and John Carney were present (PX 486, PI 19b). The voltage on the projecting wire-like electrode at the front end of the R-E-A gun was measured (PX 484A, RA 211) and some of the features of operation of the gun were evaluated as compared with the Nordson Model A electrostatic gun (PX 484A, RA 212). The R-E-A gun was tested in the Nordson laboratory again on or about February 1, 1963 (PX 484A, RA 221; PX 100).

*Defendant's Model B and BA Guns*

42. In May, 1964 Nordson obtained a Ransburg electrostatic-hydrostatic (R-E-H) hand gun manufactured by plaintiff for distribution by Binks under the name Binks Model 49 (PX 484A, RA 138). While the Binks Model 49 electrostatic spray gun was in Nordson's possession in May, 1964, the gun was X-rayed, photographed, partially disassembled, examined and tested and some of its component parts were measured to determine their dimensions (PX 484 A, RA 139). Negatives of the X-ray photographs were retained by Nordson (PX 114–1 and 114–2).

On May 13, 1964 John Carney of Nordson measured the output voltage of the Binks Model 49 gun under no load conditions and with various load resistors connected between the projecting wire-like electrode and ground (PX 484 A, RA 140; PX 112–1). About May 15, 1964, Samuel Rosen, Chief Engineer of Nordson, made a drawing, approximately full scale size, of this gun labeled "Hand Ransburg Binks gun" which included notations of the materials from which component parts comprising the gun barrel were made (PX 484A, RA 142 and 144; PX 111). The drawing also included notations of the value of the resistors within the gun barrel and the diameter of all the wire members forward of the resistors within the barrel. Other detail drawings of the Ransburg equipment were made including a dimensioned drawing of the nozzle holder of the gun (PX 484A, RA 150; PX 112–7). Nordson also tested the Binks Ransburg electrostatic gun and made a wraparound test comparison of it with the Nordson gun (PX 484A, RA 135). Wraparound is one indication of the relative paint utilization efficiency of an electrostatic spray coating device (PX 484, RA 192) and was used by Nordson for that purpose (PX 570, Nord, pp. 168, 169).

43. Utilizing the information gained from its examination and testing of the R-E-H gun, Nordson produced an electrostatic-hydrostatic hand gun which was a detailed copy of the Ransburg R-E-H gun. This gun was designated as its Model B hand gun (PX 484A, RA 160; PX 109). The drawing from which this gun was made was prepared by Samuel Rosen and bears the date June 23, 1964. (Tr. 2967–2972; PX's 109, 111, 547). This Model B gun included a projecting wire-like electrode having a diameter of .020 of an inch and positioned offset from the center line of the coating material orifice of the spray nozzle by 0.166 of an inch, exactly as included in the R-E-H gun (PX 484A, RA 162a, and RA 163a). No commercially available Nordson electrostatic spray coating equipment prior to the Nordson Model B hand gun included any form of wirelike electrode that projected forwardly from the front of the spray gun and Nordson Corporation has no drawings dated prior to June 23, 1964 illustrating such an electrode in its electrostatic spray guns (PX 484A, RA 136 and RA 137). The Nordson Model B hand gun also included two small wires, both having a diameter of less than .014 of an inch, to provide the electrical connection between the projecting wire electrode and the resistance element in the barrel of the gun, also as included in the R-E-H gun (PX 484A, RA 162e and RA 163i; PX 484C, RA 302 and 303). Nordson sold no guns prior to the Model B hand gun having such wire connectors and has no drawings dated prior to June 23, 1964 showing such wire connectors as a part of the design of its electrostatic spray guns (PX 484 A, RA 168e and RA 168i; PX 484C, RA 307e and RA 307i). Other features of the R-E-H gun present in the Model B gun and not present in earlier models of Nordson equipment or in earlier Nordson designs, are a removable member of insulating material carrying the valve seat and one of the contact wires and held to the forward end of the barrel member by a retaining nut of insulating material, and the high voltage cable entering the gun at the base of the handle rather than into a rigid cable-cartridge assembly that extended over the handle as in the Nordson Model A hand guns (PX 484A, RA 162d, RA 162f, RA 162g, and RA 162j, RA 163d, RA 163f, RA 163g and RA 163j, RA 168d, RA 168f, RA 168g; PX 484C, RA 304, RA 305, RA 307d, RA 307f and RA 307j). The Nordson Model B electrostatic hand gun was safer than the Nordson Model A electrostatic hand gun and exhibited better "wraparound" characteristics in the deposition of coating material than the Nordson Model A electrostatic hand gun (PX 570, E. T. Nord, 169).

44. Few Model B hand guns were sold (Tr. 748, 749). The Model B gun had no independent resistor element incorpo-

rated in the barrel adjacent the projecting wire-like electrode (PX 438, PX 98 4). Nordson modified its design to add a 75 megohm resistor between the termination of the high voltage cable and the electrically conductive parts at the front end of the gun. This revised hand gun, designated the Model BA gun, was the same construction as the Model B hand gun except for the addition of the resistor (PX 484A, RA 175). The Model BA hand gun was a closer copy of the Ransburg R-E-H hand gun (PX 111) and was safer than the Nordson Model B hand gun (PX 484A, RA 176). In its news release referring to either the Model B hand gun or the Model BA hand gun, Nordson stated, "A lightweight, easy-to-handle hand gun now makes it possible for painters to combine the convenience of hand spraying with the advantage of airless, electrostatic systems. * * * The technique offers spray efficiencies as high as 85%— with losses of finishing material to overspray and bounce-back running as low as 15%. * * *" (PX 146, pp. 10 and 11; PX 484C, RA 313).

*Defendant's Model C and CA Guns*

45. The electrostatic spray guns that Nordson was marketing at the time of trial were the Model C and Model CA guns (PX 121 and PX 122). These guns were first sold in early 1965 and 1966, respectively (PX 484C, RA 293 and RA 294; PX 160–5 and PX 160–6). The Model C gun retained the features of Ransburg's inventions that had been incorporated in the earlier Nordson guns. The electrical components of the Nordson Model C hand gun and of the Nordson Model CA automatic gun forwardly of the metallic valve actuating components are substantially the same (PX 484A, RA 184). The Model C and CA guns are as efficient as the Model B electrostatic hand gun (PX 484A, RA 223).

## INFRINGEMENT

46. With respect to each of the three patents in suit defendant denied that each of the accused models of its elec-

trostatic-hydrostatic guns was used in an electrostatic depositing device (PX 485, RA 1–54). However, transfer efficiency tests of the Nordson accused devices, both the hand gun as well as the automatic versions, show that they are electrostatic depositing devices. The transfer efficiency when voltage is applied to Nordson Model C and CA devices is from 22% to 65% greater than when the voltage is not applied to them. (PX's 434A–E, inclusive; Tr. 444–464.) In defendant's public representations about its Model A guns it admitted "Paint utilization is improved up to an additional 30 percent over straight heated airless" (PX 495; Tr. 2505) and about its Model C guns it stated that "from the addition, of an electrostatic power pack * * * material savings alone can amount to 50% * * *" (PX 200, Nordson advertisement 306–1–073).

47. The accused devices of the defendant (including the Model A Pre-Versa automatic guns, Model A Versa automatic and hand guns Model BA hand gun, Model C hand gun, and Model CA automatic guns) are sold for use in systems including grounded supports for articles to be coated which may be grounded conveyors, a source of high voltage that creates an electrostatic field between the spray device and the article to be coated and a suitable coating material source connected to the spray devices (PX's 200, ad 306–1–022; 430, 432 and 438). In most instances the accused devices are sold with a source of high voltage designed especially for use with the accused devices (PX 200, ad 306–7–032).

*Infringement of the '498 Patent*

48. By defendant's responses to Requests for Admission, the issues of non-infringement were reduced. However, with respect to the '498 patent defendant: (a) denied that each of its devices in a coating system were subject to variations in spacing between the charging electrode and the articles that could cause objectionable changes in potential gradient (PX 485, e. g., RA 8g); (b)

denied that each of its apparatus had a charging electrode having an "effective capacity" less than that of a metal sphere having a radius of about one centimeter (PX 485, e. g., RA 1e) ; and (c) denied that its Models B, BA, C and CA and certain of its Model A guns included a resistance immediately adjacent the charging electrode (PX 485, e. g., RA 1c and RA 4c).

49. Contrary to the position taken by defendant, when used in electrostatic coating systems, defendant's accused devices are subject to variation in spacing between the device and article being coated. Such variations could in a conventional electrostatic spray coating system cause an objectionable change in potential gradient of the electrostatic field between the spray device and the article, but when defendant's accused devices are used in the system they do not cause an objectionable change in the potential gradient under such conditions. (Tr. 465–6; PX 432.)

50. Comparative tests conducted by plaintiff on (1) a Nordson Model C device, and (2) a metal sphere of 1 centimeter in radius connected in a circuit which included a cable resistance of 189 megohms, a gun resistance of 78 megohms, and a Nordson Model B–500 voltage pack operating at full voltage output having a resistance of 500 megohms, showed that the effective capacity of the discharge system of the Nordson device under test was less than that of the aforementioned metal sphere and when exposed to an atmosphere containing the most explosive mixture of hexane and air did not cause an explosion. These tests also showed that the magnitude of the resistance in the circuit was sufficient to minimize variations in the potential gradient of the field which would have occurred had not the resistance been present. These tests also showed that at all distances objectionable discharge of electrical energy of a character to initiate a fire or a shock to an operator was avoided. (Tr. 466, 467, 495–500; PX 435 A–C, inclusive.)

51. Each of the defendant's devices includes a multimegohm resistor in the barrel to the device immediately adjacent the charging electrode of the device. The value of the resistance of such resistor is such that when the device is connected to a high voltage source in an electrostatic spray coating system the resistance in the device immediately adjacent the charging electrode is a substantial portion of the resistance of the circuit in which the device is connected (Tr. 496, 504, 505, 512; PX 428, 429, 470, 480–483).

52. The construction of the accused devices of defendant, or the use of such devices in an electrostatic spray painting system as well as such a system itself, or its use, find a complete response in one or more of the asserted claims of the '498 patent.

Each of the accused Model A devices (Pre-Versa automatic and Versa automatic and hand) or the systems incorporating such devices for spray painting respond fully and in every respect to claims 9, 12, 15, 17 and 19. In addition the accused Model A Versa hand gun or the system incorporating such hand gun for spray painting responds fully and in every respect to claims 4, 5 and 20. The accused Model BA hand gun or the system incorporating such hand gun for spray painting responds fully and in every respect to all the claims asserted. The accused Model C hand gun or the system incorporating such hand gun for spray painting responds fully and in every respect to all the claims asserted. The accused Model CA gun or the system incorporating such gun for spray painting responds fully and in every respect to Claims 8, 9, 10, 12, 13, 15 and 16 to 19 inclusive. (Tr. 768–773, PX 477.)

*Infringement of the '882 Patent*

53. By defendant's responses to Requests for Admission, the issues of noninfringement were reduced. However, with respect to the '882 patent, which was asserted against only the Nordson Model BA, C and CA electrostatic spray

guns, defendant: (a) denied that in each of the accused guns there was a single ionized atmospheric zone through which the spray was projected (PX 485, e. g., RA 22f); (b) denied that in each of the accused guns there was an atomizing device composed substantially entirely of insulating materials (PX 485, e. g., RA 26a); (c) denied that liquid coating material was atomized into fine spray particles by interaction with air (PX 485, e. g., RA 26a); and (d) denied with respect to claim 3, that substantially all the lines of electrostatic force were concentrated at the electrode tip (PX 485, e. g., RA 26e).

54. To establish the presence of only a single highly ionized zone when the accused Nordson devices are in operation, photographs were taken of the accused Nordson Model CA gun connected in a system operated under representative conditions with high voltage applied to the charging electrode of the device. These photographs illustrate that a corona glow discharge was produced at the electrode tip but provide no evidence of corona glow discharge at the spray nozzle. This evidence establishes that defendant's accused devices (Models BA, C and CA) when used in an electrostatic spray coating system, provide a single highly ionized zone through which the spray particles pass. (PX 442 A–C; Tr. 555–566).

55. Each of Nordson's accused devices, Models BA, C and CA, is either composed substantially entirely of insulating material or its front portion is formed substantially entirely of insulating material (Tr. 549, 792; PX 485, RA 24a, 24b, 25a, 25b; PX 478).

56. Defendant's accused devices when used in an electrostatic spray coating system atomizes coating material into fine spray particles by interaction with air (Tr. 724–726).

57. The construction of the accused devices of defendant and systems incorporating such accused devices for electrostatic spray painting find a complete response in one or more of the asserted claims of the '882 patent. (Tr. 792; PX 478.)

*Infringement of the '883 Patent*

58. By defendant's responses to Requests for Admission, the issues of non-infringement were reduced. However, with respect to the '883 patent, defendant: (a) denied that each of its devices projected material from the orifice with "very high velocity" (PX 485, e. g., RA 15b); (b) denied that each of its devices projected coating material from the orifice as an expanding film of coating material having straight sides (PX 485, e. g., RA 15b); (c) denied that atomization was effected from the edge of the film (PX 485, e. g., RA 15c); (d) denied that its devices gave spray spot sizes no greater than .020 of an inch (PX 485, e. g., RA 15c); (e) denied that quiescent atmosphere was maintained during operation of electrostatic spray coating systems which employed the accused devices (PX 485, e. g., RA 15d); and (f) denied that relative movement between the orifice and the article surface was transverse to the general direction of spray particle movement during particle deposition (PX 485, e. g., RA 15h).

59. Defendant's accused devices project coating material at a very high velocity, as admitted by defendant's expert, Dr. Hines (Tr. 625, 670–675, 721–725, 2298–2299).

60. High speed motion pictures taken during the operation of defendant's accused equipment under representative conditions (and single frames taken from the film), show that the spray nozzles of the accused devices produce a thin expanding film having straight sides which define an angle of at least 15°. (Tr. 668–669, 681–732; PX's 451, 452, 459, 461–468 inclusive and 486, RI 6.)

61. High-speed motion picture sequences and high-speed photographs show that liquid coating material is projected from defendant's accused devices into surrounding atmosphere as a thin expanding or fan-like film and atomiza-

tion of liquid coating material is effected from the front edge of the film. (PX 472, 473; Tr. 682–732.) "Zip strips" (strips of foil passed quickly through the spray produced from defendant's accused devices) and actual calculation sheets for each zip strip show that the spray forms, on deposition, a spray spot size of not greater than of the order of twenty thousanths of an inch in diameter. (PX 434 F–M, 460; Tr. 668.)

62. In the operation of an electrostatic spray coating system employing defendant's accused devices relative movement is effected between the device and an article being coated transverse to the general direction of the spray particle movement while sufficient spacing between the device and the article is maintained to permit substantial dispersion of the spray particles (or the spacing between the device and the article is at least several inches) and a quiescent atmosphere is maintained adjacent the article. (Tr. 650, 651, 715, 2299–2300; PX 485, RA 20e and f, and 21e and f.)

63. The construction of the accused devices of defendant or the use of such devices in an electrostatic spray painting system as well as such a system itself or its use find a complete response in one or more of the asserted claims of the '883 patent.

Each of the accused Model A guns (Pre-Versa automatic and Versa automatic and hand) and the systems for spray painting in which they are used respond fully and in every respect to claims 1, 3, 4 and 8.

Each of the accused Model A Versa automatic guns and the systems for spray painting in which they are used respond fully and in every respect to claim 11.

Each of the accused Model BA, C, and CA guns and the systems for spray painting in which they are used respond fully and in every respect to claims 1, 3 to 9 inclusive, 11, 12, 14 and 15. (Tr. 793; PX 479.)

## VALIDITY

### Relation of Specific Prior Art to Inventions in Suit

64. British Patent 688,788 (DX 155) relied upon by defendant, was before the Patent Office during the prosecution of the '498 patent in suit, having been brought to the attention of the Patent Office by Ransburg by referring to it in the specification of the '498 patent (PX 138, col. 5, lines 40–41). This reference was therefore fully considered before the '498 patent was allowed.

The vague disclosure of this reference has made possible the defendant's attempt to read much more into it than it actually teaches. This reference discloses only a coating device in the form of a tube 1 of insulating material filled with a dielectric coating material and having at its forward end an orifice from which coating material is dispersed without the aid of any mechanical force. The electrical energy is supplied to an electrode 4 located in the tube 1 well back of its orifice. The reference teaches that the electrode is located far enough from the orifice so that the dielectric coating material between it and the orifice will prevent sparks (disruptive discharge) between the embedded electrode and the surface being coated.

Defendant's expert, Dr. Hines, tried to read the '498 invention into this reference in interpreting it, although it contains no disclosure supporting his interpretation. The device disclosed in this reference differs in important respects from the invention claimed in the '498 patent. Contrary to the contention of Dr. Hines, the device shown and described in the reference does not have an exposed electrode at its forward end. The only electrode disclosed is embedded in and surrounded by dielectric material, including the coating material flowing to the orifice. This dielectric material serves as a physical barrier to a spark, just as the insulating sheath surrounding the wire of a high voltage cable serves as a physical barrier to a spark

between the wire and any object coming into contact with the outside sheath. (Tr. 2805–2808.) This reference has no disclosure of the voltage, resistance or effective capacity values recited in the asserted claims of the '498 patent. The concept of effective capacity is not taught because none of the characteristics of an electrode that determine its effective capacity is mentioned. For example, there is no teaching of this concept in this reference about electrode 4, the only electrode mentioned. Further, the reference states that no evaporation occurs from the coating material (col. 2, lines 65–67). Thus, the reference is not directed toward electrostatic coating apparatus that could be used in an atmosphere with inflammable solvent vapors without causing fires. Finally, it does not disclose a coating device provided with a handle or otherwise adapted for manual manipulation.

The British reference does not disclose or suggest (1) atomization of paint by interaction with air, or (2) providing electrostatic spray coating apparatus including a slim elongated electrode which is located so that its tip is forwardly of the paint orifice and adjacent the atomizing zone. The reference also fails to disclose the formation of a single highly ionized zone so that the paint spray passes through the ionizing zone before it expands appreciably. Therefore, this reference does not disclose or suggest the invention of the '882 patent.

The patentees of the '498 patent were faced with the problem of eliminating sparks or shocks from an electrode exposed to close approach, or even contact, by a grounded object or personnel. That problem could not be solved by the only safety expedient disclosed in the British reference; namely, by enclosing the electrode completely in a sheath of insulating material. It was solved by the development of inventions defined in the claims of the '498 patent, the subject matter of which has been in wide commercial use. There is no evidence

that the subject matter of the British reference was ever used at all.

65. *U. S. Patent 878,272* (DX 156) to Chapman relied on by defendant against the '498 and '882 patents was brought to the attention of the Patent Office by Ransburg.

This Chapman reference has nothing to do with spray painting, but rather relates to apparatus for treating paper, yarn, roving and other materials for neutralizing static electricity with which such materials may become charged. In contrast to the '498 and '882 patents in suit, which contemplate the use of direct current (DC) voltage, Chapman clearly contemplates the use of alternating current (AC) voltages to provide atmospheric ions having both positive and negative signs so that neutralization will take place regardless of the polarity of the accumulated charge. This is evident from the reference in the Chapman patent 878,272 to "radiating points" and to Chapman's earlier patent 777,-598 which specifically refers to alternating current voltage. (Tr. 2833, Tr. 3124–3125; DX 156.)

Tests show that alternating current voltages when used in an electrostatic spray painting device do not improve transfer efficiencies of paint over the same device being used with no voltage applied. These tests verify that alternating current voltage serves no useful purpose for depositing spray paint. (Tr. 2937–2944; PX 548 A–D.)

The Chapman reference contains no teaching applicable to the art of electrostatic spray coating (Tr. 2822–2823). It is in an art nonanalogous to electrostatic spray painting (Tr. 2823–2827). The Chapman reference does not disclose apparatus claimed by the '882 patent or the '498 patent (Tr. 2836). The inventions of the '498 patent and the '882 patent at the time they were made, were not obvious from anything Chapman disclosed (Tr. 2837).

66. *The Bennett references*: U.S. Patent 2,491,889 to Bennett et al (DX 141), which incorporates by reference

Bennett abandoned patent application Serial No. 427,638 (DX 142), was called to the attention of the Patent Office by Ransburg. Subsequently, the Patent Office cited both U. S. Patent 2,491,889 and the Bennett abandoned patent application during the prosecution of the parent patent application which resulted in the '882 patent. Also the Patent Office cited U.S. Patent 2,491,889 during the prosecution of the patent application which resulted in the '883 patent. Ultimately, after careful consideration the Patent Office granted the '882 and '883 patents over these references. (PX 420C and 421C). Nevertheless, both of the Bennett references are relied on by defendant against all three of the patents in suit.

The Bennett patent 2,491,889 discloses apparatus for coating glass fibers through the use of an all-metal compressed air spray gun that produces a round spray pattern. The spray gun includes a pointed electrode that projects forwardly from the liquid orifice of the gun. Sufficient voltage is applied to the electrode to produce a "slight amount of corona" at its point for "inducing a positive" charge on the lubricant so that it is attracted to the oppositely charged glass fibers.

The Bennett abandoned patent application Serial No. 427,638 discloses a method and apparatus for spray coating material which utilizes a compressed air spray gun much like the one in the Bennett patent. However, the guns of these Bennett references are different from each other (Tr. 2924–2925, 3037). The shapes of the bodies are different. In the device of the Bennett patent the fluid nozzle extends forwardly of the body whereas in the device of the Bennett abandoned application the fluid nozzle and the air orifice are generally coplanar. (Tr. 2699, 2700.) Because of the different construction at the front ends of the devices of the two Bennett references the Bennett patent device is not as good an atomizer as the device of the Bennett abandoned patent application (Tr. 3045, 3046).

The Bennett references do not disclose operating conditions such as atomizing air pressures (Tr. 2240), flow rates (Tr. 2240) or viscosities (Tr. 2241). The Bennett references do not disclose the charging of sprayed particles by ion bombardment. Instead, they contemplate that the charge will be imparted to the paint before it is atomized (Tr. 3039, 3041; last para. of specification in DX 142). In guns described by the asserted claims of the '882 patent, the concentration of spray-charging ions in the zone through which the spray passes immediately after its formation is enhanced properly shaping the electrode, by widely spacing the electrode from other conductive elements of the gun and by the fact that the forward portion of the gun body is of insulating material (PX 530, 531; Tr. 2712–2717, 3046–3048). In the Bennett guns, the entire gun body is of metal and electrically shields the electrode, thereby reducing field strength and ion concentration at the electrode-tip, where high ion concentration is necessary for best results (Tr. 2700–2702). In short, the Bennett references do not show or suggest the claimed front-end gun features which make the gun of the '882 patent a better atomizer, a more effective spray charger, and a more efficient coating device than any of the atomizing devices disclosed by Bennett. (Tr. 2712–2714, 2732; DX 141, 142; PX 139.)

The Bennett references do not disclose or suggest a hand-held gun or any of the safety features which make a hand-held gun possible and which are recited in the asserted claims of the '498 patent (Tr. 2732; DX 141, 142; PX 138).

The Bennett references do not show or suggest hydrostatic atomization, any film and spot-size characteristics, or any relationship between a slim elongated electrode and a thin expanding film of liquid coating material, which make for a commercially successful hydrostatic-electrostatic hand gun and which are recited by one or more of the asserted claims of the '883 patent (Tr. 2732; DX 141, 142; PX 140).

The Bennett references disclose nothing from which the invention of any claim in suit would have been obvious at the time such invention was made (Tr. 2732–2733).

67. *Ford Suit Model (Bennett):* To supplement the disclosures of the Bennett references, defendant introduced at the trial a physical model (DX 142B) previously built by the DeVilbiss Company for use by the Ford Motor Company in the earlier Ransburg-Ford litigation (Tr. 1960); Ransburg Electro-Coating Corp. v. Ford Motor Co., 245 F.Supp. 308; S.D.Ind.1965). Defendant's expert did not give any instructions for building the model and did not know what instructions were given for building the model but he gave testimony on the operation of the model (Tr. 2228–2229). The model, DX 142B, was not an accurate representation of the spray gun disclosed in either of the Bennett references (Tr. 2703–2704; PX 530, 531). It had a shoulder at its front end that was lacking in the guns of the Bennett references, which improved the atomization obtainable (Tr. 2236, Tr. 2705). Its electrode was of such small diameter, and hence so flexible, that it could not be supported entirely from its rear end as in the Bennett guns, but had to be additionally supported by a spider (or spacer) within the paint tube to maintain its outer end concentric with the paint orifice (PX 530, 531; Tr. 2704–11). The small diameter of the electrode improved charging of the spray by favoring ion production and ion concentration (Tr. 2706). The conditions, such as rate of paint supply and atomizing-air pressure, under which the model was operated for this case were not disclosed in the Bennett references (Tr. 2239–2240). Because of the differences in construction, the model was a better atomizer and a better spray charger than any gun disclosed in the Bennett references, and under the conditions of operation selected by defendant it produced higher transfer efficiencies (Tr. 2234, 2236, 2705–2706, 2710–2711).

Even though defendant is represented here by counsel who represented Ford in the Ransburg-Ford suit, and even though the same Dr. Hines testified there as an expert about the construction and operation of the model, DX 142B, the conditions under which the model was operated for this case differed markedly from the conditions obtaining when it was operated for the Ford case. In the operation for the Ford case, paint was supplied to the gun at a rate of only 15.6 cc. per minute and the atomizing-air pressure was only 15 p. s. i.; whereas in the operation for this case, the rate of paint supply was 72 cc. per minute and the atomizing-air pressure was 40 p. s. i. (Tr. 2239–2243).

68. *U. S. Patent 2,659,841* (DX 232) to Hampe, relied on by defendant against the '498 and '882 patents, is directed toward a charged powder sprayer. Hampe avoids the use of high voltages, the handling of which "presents various serious practical problems", and instead, describes the creation of a cloud of charged powder with voltages on the order of 2,500 to 8,000 volts (DX 232, col. 1, lines 19–20; col. 2, lines 20–22). This low voltage is the feature on which Hampe relies for safety. If 80,000 volts instead of 8,000 were used in Hampe, the energy available for causing sparks would be increased 100 times (Tr. 2814–2815). Hampe has no teaching or disclosure about effective capacity (Tr. 3103).

Hampe eliminated the high voltage that "permitted the setting up of an electrical field around the plants or surfaces to be dusted" (col. 1, lines 25–26). The electrical field for depositing dust on an article surface in Hampe is "set up solely by the cloud of electrified particles" and not by "a live electrode as in the prior devices" (Tr. 3101–3102; DX 232, col. 1, lines 45–46, 36–55 and col. 2, lines 6–7, 1–8). Hampe was not concerned with maintaining the potential gradient of an electrical field from his device to the article to obtain high deposition efficiencies. This is an important feature of the inventions of the

'498 patent and the '882 patent (DX 232, PX 138). The electrical field between the two electrodes of the device causes a deposit of particles on one of the electrodes and required Hampe to provide, as a feature of his invention, means to clean powder from the device (col. 3, line 73 to col. 4, line 24). If paint were used in the Hampe device, it would make the device inoperative (Tr. 2817). Hampe does not disclose or suggest the use of any atomizer or the relationship of an article to an atomizer. Each one of the asserted claims of the '498 patent and the '882 patent requires a paint atomizer or the step of atomizing paint. There is no suggestion in this reference that the sprayer is adapted or could be used as a hand sprayer.

69. *Bede's Use of Pressure Nozzles and Bede References Relating to Such Nozzles:* Defendant asserts that the activities of James Bede invalidate the '883 patent under 35 U.S.C. § 102(b). Defendant also contends that the inventions of the '883 patent were obvious at the time they were made in view of Bede's work under 35 U.S.C. § 103.

Bede stated that he never worked on electrostatic spray painting systems (Tr. 1178, 1191). Defendant has not offered any evidence that Bede's activities constitute an anticipation of the '883 patent under 35 U.S.C. § 102(b).

From the evidence it appears that Bede did not recognize the features of hydrostatic atomization which are essential to achieve efficient electrostatic charging and deposition as defined in the '883 patent. An instance of record which supports this conclusion is Bede's mistaken belief that an increase in pressure had very little effect on film length (Tr. 1174). This is directly contrary to testimony of several witnesses at the trial (Tr. 1107, 1896).

About the time of the invention of the '883 patent, it was not considered possible to spray paint hydraulically. Bede himself said:

"Airless spray painting is predicated on harnessing heat and pressure. Hydraulic spraying of paints has been tried for many years by many people. They failed because spraying a heavy bodied paint was impossible. To spray paint with straight hydraulic pressure, the material has to be thinned excessively (down to 5% to 10% solids). The answer to the obstacle is to heat the paint to lower its viscosity thinning it by heat instead of by solvents. Heat also builds up a vapor pressure which assists in atomization as will be explained later." (PX 493)

Bede taught that heating of the paint combined with the use of low boiling point solvents was necessary to achieve sufficiently fine hydraulic atomization. During prosecution of his Patent 2,754,228 (DX 167), Bede presented an affidavit to the Patent Office and stated, "In my process, a vapor pressure is built up in the heated liquid circuit whereby, upon release of the heated composition through a spray nozzle to the atmosphere, the solvent constituent becomes an atomizing agent, by reason of its instantaneous vaporization, to effect a further subdivision of the sprayed particles." (DX 169, p. 36.)

At the trial Dr. Hines presented test results concerning a 650017 nozzle operated under conditions which were equated with Bede's earlier work. However, none of these test results took into consideration the specific concepts taught by Bede nor is there any probative evidence of record that Bede operated such a nozzle under these conditions.

Defendant contends that if an apparatus of the type taught by Bede were used in a process such as the Ransburg No. 1 Process it would fall within the claims of the '883 patent. However, the '883 patent teaches that the electrostatic field should be "maintained either to the forward portion of the atomizer, the leading edge of the paint-film or it may extend to a spray-charging electrode disposed close to the zone of atomization". (col. 3 lines 23–26.)

Bede's activities do not support the allegation that the inventions of the '883

patent would have been obvious at the time they were made.

None of the documents of record relied on by defendant as prior art or relating to Bede's use of hydraulic nozzles disclose or suggest the inventions described and claimed in the '498 and '883 patents.

70. *Fan Nozzle Publications:* Several publications were cited by defendant as prior art against the '883 patent. The Chemical Engineers Handbook of 1941 (DX 210), the article from World Crops (DX 211), the article from The British Journal of Applied Physics (DX 213) and the catalog documents of Spraying Systems (DX 143, 144, 216, 217, and 218) disclose nozzles that will produce a flat fan-shaped film when spraying non-viscous liquids such as water or light oils at low pressures (Tr. 2692, 2857). These publications do not contain any reference to spray painting or to electrostatics, nor do they set forth the requirements for obtaining an electrostatic-hydrostatic spray painting system disclosed in the '883 patent.

Defendant excluded page 1993 of The Chemical Engineers Handbook of 1941 as a part of DX 210. This page includes a table entitled "Common Applications for Spray Nozzles". The applications or uses listed on this page include "spray painting" which is listed as a use for compressed air guns under the heading "Gas-atomizing Nozzles" but is excluded as a use under the heading "Pressure Nozzles". The exclusion of this table by defendant from DX 210 is significant because the omitted table excludes spray painting as a use for pressure nozzles, but includes spray painting as a use for gas-atomized nozzles (used with compressed air guns). (PX 528, Tr. 2687, 2688.) Defendant also did not cite the 1950 edition of The Chemical Engineers Handbook (PX 529) which likewise in a similar table on page 1175 lists uses for pressure nozzles but excludes spray painting as such use. The full disclosures of both these publications indicate that pressure nozzles including those that form "a flat, fan-shaped fluid sheet" were not in use for spray painting. James Bede's testimony on behalf of defendant is that pressure nozzles were not used for spray painting at the time he was developing a hot hydrostatic spray painting system (e. g. Tr. 1153). One of the owners of Spraying Systems Company in reply to James Bede's requests for "advice on better nozzle selection", said "Don't waste your time. We have had all sorts of people trying to spray with our nozzles, trying to spray paint for 20 years, big companies, little companies, individuals, and we gave up on spray painting with our nozzles" (Tr. 1158–1159).

71. *Lamm British Patent 679,751* (DX 230) was before the Patent Office during the prosecution of the patent application which resulted in the '883 patent.

This reference discloses a method and apparatus for spray coating articles in an enclosed booth filled with an inert gas to minimize fire hazards. (DX 230, p. 1, lines 77–80, p. 2, lines 62–64.) It utilizes a plurality of spray guns each of which comprises a hydrostatic spray device in the form of a diesel fuel nozzle which produces a circular or columnar spray pattern. (Tr. 2645–2646, 2650.) If inert gas is not used in the spray booth, then conventional spray guns using compressed air for atomization may be used. (DX 230, p. 1, lines 90–94.) The paint charging mechanism with each gun comprises eight pointed electrodes arranged like the spokes of a hubless wheel (DX 230, Fig. 6). Paint is projected from the grounded hydrostatic spray nozzle through the hub area past the inner extremities of the electrodes toward the article to be coated to form a cloud of paint particles adjacent the articles. The patent specification recites as the theory of operation that a cloud of charged spray particles sets up an electrostatic field between itself and the articles, and electrostatic forces between the cloud and the grounded articles attract the paint particles onto the articles (DX 230, p. 2, lines 53–56, 77–82; Tr. 2645).

The Lamm spray device is an inefficient coating device with an undesirable spray pattern. It would atomize poorly, and using the nozzle for atomizing paint, would make it erode very fast (PX 559, Lamm, pp. 10, 11). Lamm does not disclose atomizing means for projecting paint as thin expanding film or into an elongated spray pattern. Lamm does not disclose a single ionized zone for charging paint particles nor a single elongated electrode with a point spaced close to the zone of atomization. There is a mutual interference between the plurality of closely spaced pointed electrodes, and the field gradient at the axis of the spray is low. (Tr. 2648–2649.) Also, the paint would accumulate on the end of the needles (PX 563, Lamm, p. 12). The method or apparatus disclosed in this reference was never put into use in production. (PX 559, Lamm, pp. 13, 14; PX 560, Gardner, p. 17.) Lamm does not disclose or suggest a depositing field between the spray device and the articles (DX 230). The only depositing field Lamm discloses is that field between the articles and the cloud of spray particles surrounding the article (DX 230, p. 2, lines 53–56, 77–82; Tr. 2645).

The Lamm patent does not disclose the invention defined in any of the asserted claims in suit, and it discloses nothing which would have made the invention obvious to a man having ordinary skill in the art at the time such invention was made (PX 139 and 140; DX 230).

72. *Ransburg U. S. Patent 2,809,902* (DX 234) was cited by the defendant only against the '883 patent. This reference discloses apparatus for spray coating which combines an electrostatic bell atomizer which produces a donut pattern and a hydrostatic atomizer which produces a round pattern to fill in the hole in the donut pattern. This reference does not disclose or suggest a process or apparatus as claimed in any of the asserted claims of the '883 patent (Tr. 2863–2864). It does not disclose atomization from a film of the character described in any of the asserted claims or a field terminus or electrode of the character described in asserted claims 5, 6, 7, 9, 12, 14 and 15. (PX 140; DX 234.)

The '902 patent does not disclose the invention defined in any of the asserted claims of the '883 patent and it discloses nothing from which the invention of any of the asserted claims of the '883 patent would have been obvious at the time such invention was made (PX 140; DX 230).

73. *Slatkin Australian Patent 211,044* (DX 179) is being relied upon by defendant as a reference against the '882 and '883 patents. The reference was before the Patent Office during the prosecution of the '883 patent (PX 575) and is no more pertinent to the '882 patent than the prior art considered by the Patent Office.

The Australian reference whose corresponding U. S. patent application was previously filed in the United States Patent Office December 20, 1955, describes Slatkin's method and apparatus for spray coating (DX 179, Tr. 1483–1484). Slatkin disclosed as the best mode of practicing his invention, a device with a nozzle that produces a circular or columnar spray pattern like that produced by the Lamm British reference (Tr. 2850, 2852–2853, DX 230).

Likewise, in this best mode the spray is ionized by four electrodes or "asperities" surrounding the spray nozzle. Although the specification states that one or more electrodes may be used, it does not disclose an arrangement of less than four electrodes relative to the nozzle orifice. The charged spray is then propelled to the object to be coated by an electrostatic field. In experiments with the spray device of the Australian reference at least four electrodes were always used by the Ford Motor Company, and as many as 28 electrodes were used (PX 235, pp. 9–10, slide 13; PX 244, p. 42, slide 13; PX 253A; PX 255, p. 6 and illustration following p. 6; DX 192, Tr. 1463).

In the spraying device of the Australian reference the spacing of the elec-

trodes is a considerable distance from the nozzle orifice which results in lower charging efficiency (Tr. 2850–2852). The spraying devices of this reference and the Lamm British reference (DX 230) are similar in that they have a plurality of electrodes surrounding the nozzle orifice which mutually interfere with each other and the ions created by these electrodes have a tendency to move outwardly away from, rather than inwardly toward, the spray and, therefore, such devices are not as efficient electrical chargers as is the device disclosed in the '882 patent (Tr. 2853–2854).

The Australian patent does not disclose the inventions claimed in the '882 or the '883 patents in suit (Tr. 2855–2856). Further, the Australian patent discloses nothing which would make the inventions obvious to a man having ordinary skill in the art at the time such inventions were made (Tr. 2855–2856).

74. Defendant relies upon testimony of Slatkin that the apparatus of the Australian reference was used in 1954 to paint a "Couple of hundred" wheels. (Tr. 1462.) However, later in the same deposition Slatkin contradicted himself and testified that the painting of these wheels occurred in 1955 and 1956 (Tr. 1469). Slatkin further contradicted himself when he testified regarding whether the program for development of electrostatic-high pressure paint dispersing system (DX 193, p. 16) was ever followed. He stated he never had a chance to finish it. When reminded that this was in early 1955, he admitted that he abandoned it, stating we "moved in with the cup, and I never continued with the high pressure". (Tr. 1490–1491.) With regard to the use of the same apparatus for coating wheels, Stueckle, an engineer still employed with Ford, testified that only about a dozen wheels were painted during demonstrations from 1955 until they got involved with the rotating cups and then they were stripped and repainted (PX 566, Stueckle, p. 12). Also, Slatkin and several witnesses testified that Ford never used electrostatic-hydrostatic spray

painting equipment commercially or in production (PX 566, Stueckle, pp. 7, 20–21, 23; PX 567, Burnside, pp. 88–89, 97, 101; PX 571, Slatkin, 54–55).

75. *The Bureau of Mines publication* (DX 212) is a report describing equipment as well as test procedures utilized for investigating phenomena associated with the production of sparks and the amount of energy required from such sparks to effect explosions in solvent and air mixtures (Tr. 2840). It does not disclose or suggest electrostatic spray coating methods or apparatus or how the apparatus and tests of the Bureau of Mines publication could be used for electrostatic spray coating or the desirability of using an electrode of low effective capacity in electrostatic spray coating systems.

The use of the resistor in the equipment described in the Bureau of Mines publication is similar to that referred to and distinguished in the specification of the '498 patent (PX 138, col. 5, lines 3–10).

This publication does not disclose or suggest the inventions claimed in the '498 patent (Tr. 2846). The inventions claimed in the '498 patent would not have been obvious to one skilled in the art at the time the inventions were made in view of the Bureau of Mines publication (Tr. 2846).

76. *Ford's Use of Resistors in Electrostatic Spray Coating Systems*: Defendant contends that the use of resistance as in the '498 patent was taught and practiced by Ford's use of resistors in its electrostatic spray coating systems; however, the resistance values of the resistors used by Ford were not even of the same order of magnitude as those described and claimed in the asserted claims of the '498 patent.

Defendant relies on Slatkin's testimony that he used resistors in electrostatic coating systems in 1953 and 1954, before the date of invention of the '498 patent, and that this use of resistors continued after Ransburg's invention. An example was the use of resistor boards at the Kansas City installation (DX

194). Defendant relies on Slatkin's testimony that the purpose of the resistor board was safety to equipment, safety to human beings and safety from fire (Tr. 1432) and in support thereof cites Bulletin E5 of DX 195. Bulletin E5 of DX 195, which was prepared by Beaudry, an electrical engineer, and Slatkin, in describing the resistor board states that the total resistance of the board is 100,-000 ohms (0.1 megohms) and that the voltage drop caused by this additional resistance is "negligible". The use of this resistance board could not, therefore, effect the changes of potential gradient of the electrostatic field necessary to avoid the formation of disruptive discharges. Moreover, Bulletin E6 of DX 195 entitled "Safety Considerations in Electrostatic Painting" dated one week later than Bulletin E5 shows the extent to which Ford's use of these resistor boards was effective in safety. It states,

"All doors to the high voltage area are to be interlocked so that when a door is opened the input power is disconnected. A shorting stick should block each entrance to the booths. The metal end of the phenolic stick should be grounded with a #8 flexible wire. It should be mandatory before entering the booth that the guns be grounded manually with the stick.

"Keep all personnel at least three feet away from high voltage points."

Defendant is also relying on the testimony of Stone, another Ford electrical engineer, relative to Ford's use of resistors prior to the invention of the '498 patent. The installation about which Stone testified is represented in DX 204, 205 and 206 (Tr. 1513) and was in existence in 1948 (Tr. 1510). Stone stated that 10 one megohm resistors were used with a grid charged to 100,000 volts (Tr. 1514). Stone further testified that he would not like to try the discharge from this grid himself, that he never touched the grid while it was energized, that he never saw anyone else touch it, and that he cautioned people not to touch it (Tr. 1515).

Defendant also contends that Stone suggested the use of resistors in the manner suggested by the '498 patent in September of 1954. Mr. Stone suggested only that, "Theoretically, there are other ways to limit the current surges, such as a series resistor right at the cone." (DX 209). At this time, Stone did not suggest any specified resistance and he did not suggest any change in the atomizing cone (the paint charging electrode) (DX 209). There is no other probative evidence of Stone's suggestions.

Ford's use of resistors was typical of the use made at that time. Ford did not use resistors having resistance values of such magnitude as to be effective to maintain the potential gradient at a value below that at which sparking occurs but consistent with high deposition efficiencies. Ford used resistors of such a resistance value that the voltage drop was "negligible". There is no evidence that anyone at Ford recognized the concept of effective capacity or the combination of lowering the effective capacity of a charging electrode and using it with resistances on the order of several megohms per kilovolt. The evidence upon which defendant relies does not teach or suggest the invention of the '498 patent, but instead shows that those skilled in the art when faced with the problems confronting the inventors of the '498 patent did not solve those problems. This supports the patentable nature of the '498 invention as not obvious to those skilled in the art at the time the invention was made.

*Relation of Prior Art to the Inventions in Suit*

77. None of the prior art references relied on by the defendant constitutes an anticipation of the inventions of the asserted claims of the '498 patent. (PX 540, Tr. 2919.)

78. The prior art references relied on by the defendant, whether considered separately or in combination, do not teach or disclose the inventions defined in the asserted claims of the '498 patent. (Tr. 2920.)

79. None of the prior art references relied on by defendant which was not before the Patent Office during the prosecution of the '498 patent is any more pertinent than the prior art references that were before the Patent Office (Tr. 2920, PX 540).

80. The inventions defined in the asserted claims of the '498 patent would not have been obvious to anyone skilled in the art of electrostatic spray coating at the time the invention of the '498 patent was made. (Tr. 2920–2921, PX 540.)

81. None of the prior art references relied on by the defendant constitutes an anticipation of the invention of the asserted claims of the '882 patent (PX 539, Tr. 2925).

82. The prior art references relied on by the defendant, whether considered separately or in combination, do not teach or disclose the invention defined in the asserted claims of the '882 patent (PX 539, Tr. 2926–2927).

83. None of the prior art relied on by defendant and which was not before the Patent Office during the prosecution of the '882 patent is any more pertinent than the prior art references that were before the Patent Office. (Tr. 2926, PX 539.)

84. The inventions defined in the asserted claims of the '882 patent would not have been obvious to anyone skilled in the art of electrostatic spray coating at the time the invention of the '882 patent was made. (Tr. 2926–2927, PX 539.)

85. None of the prior art references, relied on by the defendant constitutes an anticipation of the inventions of the asserted claims of the '883 patent (PX 541, Tr. 2933–2934).

86. The prior art references relied on by the defendant, whether considered separately or in combination do not teach or disclose the inventions defined in the asserted claims of the '883 patent (PX 541, Tr. 2935).

87. None of the prior art references relied on by defendant and which was not before the Patent Office during the prosecution of the '883 patent is any more pertinent than the prior art references that were before the Patent Office. (Tr. 2934, PX 541).

88. Prior to trial, defendant made an extensive search in the U. S. Patent Office, and a search for European art at the Search Center at The Hague (PX 141–2, PX 141–5). In addition to these searches, Mr. Henry, Nordson's patent counsel, investigated sources of prior art by contacting patent counsel of the General Electric Company, The Ford Motor Company, The High Voltage Engineering Corporation, The Carborundum Company, Westinghouse Electric Corporation, Mr. Robin Beach, a consulting engineer, and Mr. Robert Kahn, who represented the H. G. Fischer & Co. in prior litigation on these three patents (PX 141–1, 141–2, 141–4, 141–6, 141–7, 141–10 and 141–11). The results of defendant's extensive investigations confirm that the best prior art was before the Patent Office, and that nothing has been cited by defendant that adversely affects the presumption of validity arising from the issuance of the patents in suit.

*Secondary Factors Supporting Validity Commercial Success*

89. The striking commercial success enjoyed by the invention of the patents in suit strengthens the statutory presumption of validity of these inventions.

From 1959 to the end of 1966 the sale of paints, varnishes and lacquer for industrial uses increased on an average of approximately 5 percent per year (PX 538; Tr. 2776–2777) or approximately 48 percent.

The marketing of electrostatic spray coating equipment including hand guns embodying one or more of the inventions of the patents in suit began in 1958. The first full year of marketing hand gun equipment was in 1959. In that year 216 hand guns were leased (127 No. 2 Process hand gun units and 89 No. 2 Process hand gun spares) (PX 536). In

1966 the total number of hand guns sold, leased and licensed embodying one or more of the inventions in suit was 930 (46 No. 2 Process hand gun units, 33 No. 2 Process hand gun spares, 370 R-E-A hand guns, 388 R-E-H hand guns and 93 Eclipse hand guns) (PX 536). This is an increase of over 330 percent from 1959 to the end of 1966.

Gross income from the marketing of electrostatic spray painting methods and apparatus embodying one or more inventions of the patents in suit in 1959 was $224,354. This figure is the sum of initial and monthly fees received in 1959 for the use of the No. 2 Process hand guns. (PX 536). In 1966 the gross income from the sale, lease and licensing of electrostatic spray painting methods and apparatus embodying one or more inventions of the patents in suit amounted to $2,186,041. This figure is the sum of initial and monthly fees received in 1966 for the use of the No. 2 Process hand gun, which amounted to $343,614, the gross income from the sale in 1966 of R-E-A and R-E-H apparatus, both hand gun and automatic, which amounted to $1,795,928, and license fees from Eclipse received in 1966, which amounted to $46,500 (PX 536, PX 537). This is an increase in gross income from the marketing of electrostatic spray coating methods and apparatus embodying one or more inventions of the patents in suit from 1959 to the end of 1966 of over 870 percent. The gross income from the sale, lease and licensing of electrostatic spray painting methods and apparatus embodying one or more inventions of the patents in suit from 1958 to the end of 1967 was approximately $10,400,000 (PX 536, PX 537).

*Long Felt Want and Prior Failures*

90. The history of the electrostatic spray painting art makes clear that there was both a long felt want for the inventions of the patents in suit and prior failure by others to achieve the results by those inventions.

The U. S. filing date of the British Patent 591,474 (PX 576, tab 22) shows that electrostatic hand guns were sought as early as 1944. In the late 1940's General Motors Corporation sought to develop electrostatic spray coating equipment "that would be as free of fire hazard and as efficient as possible" (PX 559, Lamm, pp. 4–5). Both General Motors Corporation and the Ford Motor Company sought to develop electrostatic-hydrostatic spray coating processes and apparatus as indicated by British Patent 679,751 (DX 230) and Australian Patent 211,044 (DX 179) but such electrostatic-hydrostatic systems never went into production use (PX 566, Stueckle, pp. 7–20, 23; PX 567, Burnside, pp. 88–89, 97, 101; PX 571, Slatkin 54–55, PX 559, Lamm, p. 10; PX 560, Gardner, p. 8). The DeVilbiss Company did not market electrostatic spray coating equipment of its own design until long after the inventions of the patents in suit had been made (Tr. 1076–1077), in spite of the fact that (1) it was introduced to electrostatic spray painting as early as 1937 by plaintiff's demonstration of its No. 1 Process (Tr. 1071; PX 563, Peeps, p. 5); (2) it also became fully familiar with the teachings of W. H. Bennett (DX 141 and 142) and his associates in 1942 by doing joint development work on electrostatic spray painting with Slayter Electronics Corporation (PX 317, PX 536, Peeps, pp. 1–25, PX 565, Otto, pp. 7, 10–17, PX 564, Simkins, pp. 22–23); (3) it thereafter also did development work in electrostatic coating which resulted in U. S. Patent 2,625,590 (PX 215) but which never became commercial (Tr. 1073–1074, PX 563, Peeps, p. 30); and (4) it also did development work in electrostatic coating with the General Electric Company from 1944 to about 1948 (PX 563, Peeps, pp. 30–59).

Such history is evidence of non-obviousness of the inventions in suit.

91. The apparatus and methods using atomization by compressed air and by hydraulic forces with which the technical personnel of General Motors Co., the Ford Motor Co. and the DeVilbiss Co. experimented in the 1940's and in the 1950's included a multiplicity of pointed

electrodes (PX 559, Lamm, pp. 5–7; PX 310; PX 253A; PX 255, p. 6 and illustration following p. 6; PX 215; PX 364; PX 563, Peeps, pp. 29, 56). Instead of using a single needle electrode, the use of an array of pointed electrodes was typical of the approach being used by skilled workers in the art of electrostatic painting in their attempts to develop a system that was competitive with the Ransburg No. 1 and No. 2 systems (Tr. 2649).

*Conduct of Defendant and Others*

92. Defendant's participation in the prosecution of the Westinghouse patent applications under which it is licensed indicates it believed the inventions in suit to be patentable.

In July of 1965, the United States Patent Office cited Ransburg Patents 3,048,-498 and 3,169,883 against Westinghouse Patent Application Serial No. 178,478 under which the Nordson Corporation was licensed. Nordson determined that if patent claims were issued to Westinghouse covering Ransburg's commercial equipment and under which Nordson was licensed, Nordson would be in a more advantageous position with respect to Ransburg. Since the date of Griffith's invention in the Westinghouse application appeared to be earlier than the filing date of at least the application upon which the Ransburg '883 patent was based, the first inventor of that subject matter of the Ransburg patent appeared to Nordson to be Griffiths. (PX 484A "Factual statement with respect to Plaintiff's Requests for Admission 62–72, 74–77, 86 and 87, inclusive".)

Therefore, Eric Nord and Nordson's patent counsel proposed claims to be presented in the Westinghouse patent application.

In September, Bosworth, defendant's patent counsel, proposed claims in addition to others discussed earlier in the month with Westinghouse patent counsel (PX 193–1). One of these claims defined embodiments of all the patents in suit (Tr. 2973; 2981). The claims were prepared by Eric Nord, and defendant's patent counsel, Frank Henry, and Bosworth with Ransburg's Patents 3,048,498

and 3,169,883 before them (PX 44A–RA 70; PX 193–1). In October of 1965 Bosworth proposed that Westinghouse patent counsel submit an affidavit from Eric Nord to promote the progress of the Westinghouse application, as stated by Bosworth, "to the priority and glory of Ed Griffiths' invention" (PX 484A–RA 62, RA 63; PX 65). In December of 1965, Henry suggested additional claims to be considered by Westinghouse patent counsel and urged Westinghouse patent counsel to take Eric Nord to meet with the Examiner in Washington as a Westinghouse "licensee and successful exploiter" of their invention of Westinghouse patent application Serial No. 178,-478 (PX 484A–RA 66, RA 67). Eric Nord discussed these claims with Nordson's patent counsel prior to their submission to Westinghouse and was kept apprised by defendant's patent counsel of the assistance they were giving Westinghouse patent counsel during the prosecution of Westinghouse patent application Serial No. 178,478 (PX 484A–RA 68).

In September, 1965 Bosworth suggested that Westinghouse give defendant an option to buy patent application Serial No. 178,478 (PX 484A–RA 86). In December of 1965, Eric Nord offered to buy this patent application and the patent application which issued as U. S. Patent 3,246,844 (PX 484A–RA 87, RA 88; PX 148; PX 59).

Westinghouse patent application Serial No. 178,478 was ultimately abandoned. It was succeeded by continuation application Serial No. 554,247 under which defendant is currently licensed. Claims originally filed in the pending application Serial No. 554,247 (Westinghouse Electric Case No. 330,200) incorporated suggestions made by defendant's patent counsel and transmitted to Westinghouse.

Defendant's attempts to secure patent claims broad enough to cover each of plaintiff's inventions in the Westinghouse patent applications, and defendant's attempts to extend its interests under these applications from a non-exclusive license to complete ownership are

inconsistent with its present position that plaintiff's inventions in suit are unpatentable.

93. Defendant's attempts to secure patent protection of its own inventions are inconsistent with its present position that the '498 patent is not valid.

Samuel Rosen filed U. S. Patent Application Serial No. 411,251 in the United States Patent Office on November 16, 1964 and assigned the application to defendant. This patent application issued to defendant as U. S. Patent No. 3,348,186 (PX 550 and PX 551). Figure 4 of this application shows defendant's Model B gun (PX 484A RA 170). Claim 12 of U. S. Patent Application Serial No. 411,251, as filed, defined an apparatus for establishing an electrostatic field remote from a high voltage source and covered the Model B gun illustrated in Figure 4 (PX 484A 44A RA 171 and RA 173). Claim 13 defined a portion of an electrostatic spray coating system (PX 549 and PX 551). Claims 12 and 13 contain the term "effective electrostatic capacity" (Tr. 2983 and Tr. 2984). The description in the specification of this patent application in column 9 of Patent 3,-348,186 starting at line 56 indicates that Rosen, contrary to position taken before trial by defendant, had a rather complete understanding of the term "low effective electrostatic capacity" (Tr. 2987 and Tr. 2988).

Defendant also contends that the '498 patent is invalid because apparatus and methods that fall within its claims are not absolutely safe. Defendant is not, however, using this as a standard of patentability with respect to its own inventions, as indicated by its own representations in its patent application. Claims 12 and 13 (which define a portion of an electrostatic spray coating system such as the Model B gun) did not issue in U. S. Patent 3,348,186 (PX 550); however, a divisional patent application is still pending containing these claims (Tr. 2983). This patent application states, "The invention also has as an object the provision of such a high ten-sion cable and discharge element combination that may be simply and conveniently mounted and carried on and combined with a spray gun so that electrostatic spray coating may be easily and safely performed." (See PX 550, col. 5, lines 17–27.) Defendant's Model B gun that falls within the claims sought in this application does not operate as safely as its Model C gun (PX 484A RA 207) and the Model C gun can cause ignition (Tr. 1259).

*Miscellaneous Defenses of Invalidity*

94. The inventions defined in the asserted claims of the patents in suit produce a new and useful result, and the method defined in the asserted method claims thereof comprise more than the mere function or expected result or consequence of the use of the apparatus disclosed (Tr. 160–165; Tr. 174–176; Tr. 180–182; Tr. 284–287; Tr. 522–525; 2639 to 2641; 2352; Tr. 2918–2931.)

95. Paragraphs 19, 26 and 33 of defendant's Answer and Counterclaim to Plaintiff's Amended Complaint allege that each of the patents in suit is invalid and void and not infringed because said patents do not describe the inventions in the manner required by law and do not particularly point out and distinctly claim the inventions covered thereby, as required by law. The weight of the evidence adduced at the trial did not support these allegations. As required by Title 35 U.S.C. Sec. 112, the specification of each of the patents in suit: (1) Does contain a written description of the invention, and of the manner and processes of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art 'to which it pertains, or with which it is most nearly connected, to make and use the same, and does set forth the best mode contemplated by the inventor or inventors of carrying out the invention; and (2) does conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant or applicants regard as the invention.

96. The electrical discharge from a polished steel sphere of 1 centimeter radius mounted on the end of a 1000 megohm resistor will not create an objectionable shock and will not ignite mixtures of the most readily ignitable nature such as xylene and air at 115°F and methyl ethyl ketone and air at 30°F at any applied voltage below and up to 100 KV. However, such an electrical discharge will ignite a saturated mixture of hexane and air at 3°F and at atmospheric pressure which is one of the most readily ignitable mixtures. The reference at Column 12, lines 74 and 75 of Patent 3,048,498 to a mixture of hexane and air would not mislead a person skilled in the art of electrostatic painting. A person skilled in the art would be able to make and use the invention and to determine if a method or apparatus meets the claims of the patent.

97. Defendant's expert, Dr. Hines, used DX 269, a metal sphere of 2.8 centimeters radius mounted on the end of a 150 megohm resistor, as a test device at the defendant's laboratories in Amherst, Ohio. No written records, photographs, or drawings were introduced in support of Dr. Hines' testimony about the test conducted with this device. Dr. Hines' testimony indicates that the teachings of the '498 patent were ignored in this test. (Tr. 2120–2126.)

98. At Eric Nord's request, C. A. Meyer performed tests in which a series of metal spheres with radii of one centimeter or less were mounted on the ends of resistors of different values in an attempt to determine the minimum ignition voltage for various air-solvent mixtures. Meyer testified that these tests were conducted by electrically charging the metal sphere and lowering it into a grounded metal pail containing hexane or benzene and that the metal sphere was immersed in the solvent in the process of getting an explosion. Meyer further testified that the "Test Voltage" at the test sphere was set to the desired level with a calibrated voltmeter and the voltage at the test sphere is indicated at DX 242B and 242C. Defendant's expert,

Dr. Hines, was in court at the time these tests were being conducted in Amherst, Ohio. Dr. Hines took no part in the preparation of DX 242A through 242F. Dr. Hines' testimony with respect to these tests was based only on knowledge of the results which were given to him. The tests disclosed in the '498 patent beginning at column 12, line 44, and including the portion from line 67 to line 75, are different from the tests conducted by Meyer and summarized in DX 242A through 242F. This portion of the '498 patent speaks of the voltages applied to the total circuit resistance and of electrical discharges only through solvent-air mixtures (Tr. 1238–1257, 2291–2297, 2901).

99. Paragraphs 4, 8 and 11 of defendant's answer and counterclaim to plaintiff's amended complaint alleged that each of the patents in suit "was issued inadvertently, mistakenly, exigently and negligently". No probative evidence was adduced at the trial in support of these general allegations.

100. Paragraphs 15, 22 and 29 of defendant's answer and counterclaim to plaintiff's amended complaint alleged that each of the patents in suit is invalid because the inventions described therein and patented thereby fail to exhibit any unexpected or surprising result over devices, practices, and methods known in the prior art prior to the invention of the subject matter defined in the claims of the patent in suit. The weight of the evidence adduced at the trial did not support these allegations.

101. Paragraphs 16, 23, and 30 of defendant's answer and counterclaim to plaintiff's amended complaint alleged that the inventors named in the patents in suit are not the first, original and/or joint inventors of the subject matter covered by these patents. The weight of the evidence adduced at the trial did not support the contention that any of the specific inventions which are the subject matter of the patents in suit were those of another and no probative evidence was adduced that any prior art reference relied upon by defendant was

in itself a complete anticipation of the invention of any of the patents in suit.

102. Paragraphs 17, 24 and 31 of the defendant's answer and counterclaim to plaintiff's amended complaint alleged that the inventions covered by the patents in suit were invented by others and were disclosed and/or described in patents and printed publications more than one year prior to the filing dates to which each of the patents in suit is entitled. The weight of the evidence adduced at the trial did not support the contention that any of the specific inventions which are the subject matter of the patents in suit were those of another and no probative evidence was adduced that any prior art reference relied upon by defendant was in itself a complete anticipation of the invention of any of the patents in suit.

103. Paragraphs 18, 25 and 32 of defendant's answer and counterclaim to plaintiff's amended complaint alleged that each of the patents in suit is invalid and void because the inventions covered thereby were invented, known or used by others, and/or were in public use and/or on sale in the United States long prior to the invention of the subject matter defined in the claims of the patents in suit and/or more than one year prior to the filing of the applications for said patents. The weight of the evidence adduced at the trial did not support the contention that any of the specific inventions which are the subject matter of the patents in suit were those of another and no probative evidence was adduced that any prior art reference relied upon by defendant was in itself a complete anticipation of the invention of any of the patents in suit.

104. In paragraphs 20, 27 and 34 of defendant's answer and counterclaim to plaintiff's amended complaint it is alleged that plaintiff is "estopped from maintaining and asserting" the patents in suit against defendant because of the restrictions and limitations imposed on each of the patents during the proceedings pertinent thereto in the United States Patent Office. No probative evidence was adduced at the trial in support of these allegations.

105. In paragraphs 21, 28 and 35 of defendant's answer and counterclaim to plaintiff's amended complaint, defendant alleged that each of the patents in suit is void and invalid because the inventions covered thereby were or have been abandoned by plaintiff and the patentees. No evidence was adduced at the trial in support of these allegations.

106. In paragraph 36(d) of defendant's answer and counterclaim to plaintiff's amended complaint, defendant alleged that plaintiff is barred by laches from asserting the patents in suit against defendant. No probative evidence was adduced at the trial in support of this allegation.

107. In paragraph 37 of defendant's answer and counterclaim to plaintiff's amended complaint, defendant alleged that two of the patents in suit (U. S. Letters Patent No. 3,169,882 and No. 3,169,883) are invalid and void under Title 35 U.S.C. Sec. 185 for failure to comply with the requirements of Title 35 U.S.C. Sec. 184, in that the retroactive licenses that were obtained under Title 35 Sec. 184 were invalid. No evidence was adduced at the trial in support of these allegations.

108. Paragraph 38 of defendant's answer and counterclaim to plaintiff's amended complaint alleged that the patents in suit are unenforceable because of plaintiff's misuse thereof with respect to royalties assessed under various express and implied licenses on different terms varying nonuniformly, concealment of said royalties or license fees, the exaction of an exorbitant royalty, and because of defendant's attempt to extend the monopoly accorded to the patents in suit beyond that sanctioned by the patent laws. No probative evidence was adduced at the trial in support of these allegations.

**480**

### CONCLUSIONS OF LAW

Upon the foregoing Findings of Fact, the Court concludes the law to be as follows:

1. Every Finding of Fact deemed to be a conclusion of law is hereby concluded as a matter of law.

2. The Court has jurisdiction of the parties and of the subject matter of this action, as set forth in plaintiff's Amended Complaint, and defendant's Answer and Counterclaim. Venue is properly laid in this District.

3. United States Letters Patent No. 3,048,498, issued August 7, 1962, entitled "ELECTROSTATIC SPRAY COATING SYSTEM", United States Letters Patent No. 3,169,882, issued February 16, 1965, entitled "ELECTROSTATIC COATING METHODS AND APPARATUS", and United States Letters Patent No. 3,169,883, issued February 16, 1965, entitled "ELECTROSTATIC COATING METHODS AND APPARATUS", were each duly and legally issued, each is solely and exclusively owned by plaintiff Ransburg Electro-Coating Corp., and said plaintiff is the owner of all rights thereunder, including the right to sue for and recover for past infringement, and to enjoin future infringement thereof.

4. Plaintiff has maintained the burden of proving the essential facts alleged in its Amended Complaint. Defendant has not maintained its burden of proving the essential facts alleged in its Answer and Counterclaim.

5. In determining whether or not the accused electrostatic spray coating apparatus and processes infringe the patents in suit, resort must be had in the first instance to the words of the patent claims. If the accused devices or processes fall clearly within one patent claim, infringement is made out, and that is the end of it. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). In applying the claims in such a manner, the patent claims are always to be read or interpreted in light of the patent specification. Schriber-

Schroth v. Cleveland Trust Co., 311 U.S. 211, 217, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Adams v. United States, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

6. The electrostatic spray coating apparatus made, used and sold by defendant meets every requirement of claims 4, 5, 15, 18, 20 and 22 of plaintiff's United States Letters Patent No. 3,048,498, in suit, and thereby infringes the aforesaid patent, and the use of said apparatus for electrostatically spray coating articles in a manner normally contemplated by defendant in a system employing high voltage electricity meets every requirement of claims 12, 13 and 19 of plaintiff's patent No. 3,048,498, in suit.

7. Defendant has actively induced infringement of claims 8–10, 12, 13 and 19 of United States Letters Patent No. 3,048,498, by its manufacture and sale to others of electrostatic spray coating apparatus, knowing that such apparatus was particularly designed for use in a manner such that it would infringe said claims of said patent, and knowing that such apparatus was to be so used.

8. Defendant has committed acts of contributory infringement by making and selling components of apparatus covered and secured by claims 8, 9 and 10 of United States Letters Patent No. 3,048,498, and by selling apparatus for use in practicing methods covered and secured by claims 12, 13 and 19 of said Letters Patent to others, which components and apparatus constitute material parts of the inventions covered and secured by said claims, said defendant knowing the same to be especially made or especially adapted for use in infringement of said Letters Patent, and not staple articles or commodities of commerce suitable for substantial noninfringing use.

9. The electrostatic spray coating apparatus made, used and sold by defendant meets every requirement of claims 3, 8 and 12 of plaintiff's United States Letters Patent No. 3,169,882, in suit, and thereby infringes the aforesaid patent.

10. Defendant has actively induced infringement of claims 3 and 12 of United States Letters Patent No. 3,169,882, by its manufacture and sale to others of electrostatic spray coating apparatus, knowing that such apparatus was particularly designed for use in a manner such that it would infringe said claims of said patent, and knowing that said apparatus was to be so used.

11. Defendant has committed acts of contributory infringement by making and selling components of apparatus covered and secured by claims 3 and 12 of United States Letters Patent No. 3,169,-882, which components constitute material parts of the inventions covered and secured by said claims, said defendant knowing the same to be especially made or especially adapted for use in infringement of said Letters Patent, and not staple articles or commodities of commerce suitable for substantial noninfringing use.

12. The electrostatic spray coating apparatus made, used and sold by defendant meets every requirement of claims 11, 12 and 15 of plaintiff's United States Letters Patent No. 3,169,883, in suit, and thereby infringes the aforesaid patent, and the use of said apparatus in a manner normally contemplated by defendant in a system employing high voltage electricity meets every requirement of claims 1, and 3–9 of plaintiff's patent No. 3,169,883 in suit.

13. Defendant has actively induced infringement of claims 1, and 3–9 of United States Letters Patent No. 3,169,-883, by its manufacture and sale to others of electrostatic spray coating apparatus, knowing that such apparatus was particularly designed for use in a manner such that it would infringe said claims of said patent, and knowing that said apparatus to be so used.

14. Defendant has committed acts of contributory infringement by making and selling components of apparatus covered and secured by claim 14 of United States Letters Patent No. 3,169,883, and by selling apparatus for use in practicing methods covered and secured by claims 1 and 3–9 of said Letters Patent to others, which components and apparatus constitute material parts of the inventions covered and secured by said claims, said defendant knowing the same to be especially made or especially adapted for use in infringement of said Letters Patent, and not staple articles or commodities of commerce suitable for substantial noninfringing use.

15. United States Letters Patent No. 3,048,498, entitled "ELECTROSTATIC SPRAY COATING SYSTEM", as to each and every asserted claim thereof is in all respects valid and subsisting in law.

16. United States Letters Patent No. 3,169,882, entitled "ELECTROSTATIC COATING METHODS AND APPARATUS", as to each and every asserted claim thereof is in all respects valid and subsisting in law.

17. United States Letters Patent No. 3,169,883, entitled "ELECTROSTATIC COATING METHODS AND APPARATUS", as to each and every asserted claim thereof is in all respects valid and subsisting in law.

18. The statutory presumption of validity [1] arising from the issuance of a patent is not an idle gesture, and the burden of establishing invalidity of a patent rests heavily upon the party asserting it. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Copease Mfg. Co. v. American Photocopy Equip. Co., 298 F.2d 772, 777 (7th Cir. 1961); Hazeltine Research, Inc. v. Dage Electric Co., 271 F.2d 218, 224 (7th Cir. 1959); Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 3 (7th Cir. 1953). This statutory presumption of validity is strengthened where the prior art relied upon by the accused infringer is the same as, and no better than, that art considered and rejected by the experts of the Patent Office. Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765, 768 (7th Cir. 1962); Amp, Inc. v. Vaco

1. Title 35 U.S.C. § 282.

482

Products Co., 280 F.2d 518, 521 (7th Cir. 1960). Defendant Nordson Corporation has not presented any prior art better than that considered and rejected by the experts of the Patent Office during the prosecution of United States Letters Patents No. 3,048,498, No. 3,169,882 and No. 3,169,883, and has not maintained its heavy burden of proof required to overcome the statutory presumption of validity of the patents in suit.

19. No one of the patents, publications, or devices relied on by defendant discloses or teaches the subject matter defined by the claims of patent No. 3,-048,498, in suit, and, therefore, defendant has not proved an anticipation of the invention claimed in the '498 patent under 35 U.S.C. § 102(a), or any statutory bar of said invention under 35 U.S.C. § 102(b). Defendant has likewise not proved any other invalidating defense under 35 U.S.C. § 102.

20. No one of the patents, publications, or devices relied on by defendant discloses or teaches the subject matter defined by the claims of patent No. 3,-169,882 in suit, and, therefore, defendant has not proved an anticipation of the invention claimed in the '882 patent under 35 U.S.C. § 102(a), or any statutory bar of said invention under 35 U.S.C. § 102 (b). Defendant has likewise not proved any other invalidating defense under 35 U.S.C. § 102.

21. No one of the patents, publications, or devices relied on by defendant discloses or teaches the subject matter defined by the claims of patent No. 3,-169,883 in suit, and, therefore, defendant has not proved an anticipation of the invention claimed in the '883 patent under 35 U.S.C. § 102(a), or any statutory bar of said invention under 35 U.S.C. § 102 (b). Defendant has likewise not proved any other invalidating defense under 35 U.S.C. § 102.

22. In considering the question of obviousness of a patented invention, hindsight is of no value in determining what would have been obvious at the time the invention was made. Diamond Rubber Co. of New York v. Consolidated Tire Co., 220 U.S. 428, 434, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Walt Disney Productions v. Fred A. Niles Communications Center, Inc., 369 F.2d 230, 234 (7th Cir. 1966); Shumaker v. Gem Mfg. Co., 311 F.2d 273, 276 (7th Cir. 1962); Hazeltine Research, Inc. v. Dage Electric Co., 271 F.2d 218, 225 (7th Cir. 1959). The prior art patents, publications and prior devices relied on by defendant, either alone or in any combination, fail to show that the subject matter disclosed and claimed in the '498 patent in suit would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the patented subject matter pertains. Accordingly, defendant has not proved that the '498 patent is invalid for obviousness under 35 U.S.C. § 103. Instead, the numerous prior patents, publications and devices relied on by the defendant illustrate that many unsuccessful attempts were made, before the invention of the '498 patent, to fulfill a long-felt need for an electrostatic spray coating apparatus and process which would perform safely and efficiently. Minneapolis-Honeywell Reg. Co. v. Midwestern Instruments, Inc., 298 F.2d 36, 38 (7th Cir. 1961); Reynolds v. Whitin Machine Works, 167 F.2d 78, 83–84 (4th Cir. 1948).

23. The prior art patents, publications and prior devices relied on by defendant, either alone or in any combination, failed to show that the subject matter disclosed and claimed in the '882 patent in suit would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the patented subject matter pertains. Accordingly, defendant has not proved that the '882 patent is invalid for obviousness under 35 U.S.C. § 103. Instead, the numerous prior patents, publications and devices relied on by the defendant illustrate that many unsuccessful attempts were made, before the invention of the '882 patent, to fulfill a long-felt need for an electrostatic spray coating apparatus and process which would perform safely and efficiently.

24. The prior art patents, publications and prior devices relied on by defendant, either alone or in any combination, fail to show that the subject matter disclosed and claimed in the '883 patent in suit would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the patented subject matter pertains. Accordingly, defendant has not proved that the '883 patent is invalid for obviousness under 35 U.S.C. § 103. Instead, the numerous prior patents, publications and devices relied on by the defendant illustrate that many unsuccessful attempts were made, before the invention of the '883 patent, to fulfill a long-felt need for an electrostatic spray coating apparatus and process which would perform safely and efficiently.

25. As required by 35 U.S.C. § 103, the Court has determined the scope and content of the prior art, and has given full and careful factual consideration to the differences between that prior art and the claimed subject matter of the patents in suit; and to the level of ordinary skill in the art, with emphasis on the actual performance of men of at least ordinary skill. Against this factual background, the Court concludes that the claimed subject matter would not have been obvious to a man of ordinary skill in the art, at the time the inventions were made, in view of the prior publications, devices and patents relied upon by defendant, taken either singly or in combination. Moreover, this conclusion of non-obviousness is reinforced by the objective evidence of patentability present in this case, including the great merit and commercial success of the patented inventions, the long-felt and unsatisfied need for an electrostatic spray coating apparatus and process which would perform safely and effectively, and the numerous unsuccessful attempts on the part of workers of at least ordinary skill to fill that need. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

26. The burden of proof rests heavily upon the party asserting a defense of public use of a patented invention. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed 523 (1923); Devex Corp. v. General Motors Corp., 321 F.2d 234, 239, (7th Cir.1963). Defendant has not satisfied the heavy burden of proof required to establish public use under 35 U.S.C. § 102(b) of the spray coating apparatus and processes embodying the inventions disclosed and claimed in the '498, '882 and '883 patents in suit.

27. The burden of proof rests heavily upon the party asserting a defense of the patented invention having been on sale for more than one year prior to the filing of the application from which the patent being asserted matured. Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325, 330 (N.D. Ill.1963); Minnesota Min. & Mfg. Co. v. Permacel-Le Page's Inc., 222 F.Supp. 540, 547–548 (N.D.Ill.1963), aff'd 334 F.2d 820 (7th Cir. 1964). Defendant has not satisfied the heavy burden of proof required to establish such a sale of the devices embodying the inventions disclosed and claimed in the '498, '882 and '883 patents in suit, as required under 35 U.S.C. § 102(b).

28. An allegation that a patent was procured through misrepresentation must be established by clear and convincing evidence. The burden of proof rests heavily upon the party making such charge. Armour & Co. v. Wilson & Co., 168 F.Supp. 353, 358 (N.D.Ill. 1958), rev'd in part, 274 F.2d 143, 148 (7th Cir. 1960); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 394–395 (10th Cir. 1965). Defendant has not satisfied the heavy burden of proof required to establish that the patentees or their assignee acted fraudulently, intentionally or wilfully, and the proofs are wholly inadequate to render any of the patents in suit unenforceable in equity against an alleged infringer. To hold otherwise would work a forfeiture of the patentees' property in the absence of unconscionable or morally reprehensible conduct, something which equity is always reluctant to do. Shinsaku Nagano

484

v. McGrath, 187 F.2d 753, 759 (7th Cir. 1951); Martin v. Ford Alexander Corp., 160 F.Supp. 670, 685 (S.D.Cal.1958); Clark v. Ace Rubber Products, 108 F. Supp. 200, 205 (N.D.Ohio 1952); Aerosol Research Co. v. Scovill Mfg. Co., 334 F.2d 751, 756 (7th Cir. 1964); Helene Curtis Industries v. Sales Affiliates, 121 F.Supp. 490, 509–512 (S.D.N.Y.1954), aff'd 233 F.2d 148 (2d Cir. 1956). Moreover, to affect the statutory presumption of validity of an issued patent, it must be clearly and convincingly proved that a misrepresentation had, in fact, been made to the Patent Office, and that such misrepresentation was essentially material to the issuance of the patent. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 373, 374, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Aerosol v. Scovill, supra, 334 F.2d at 756. Accordingly, none of the patents in suit has been rendered unenforceable due to any unequitable conduct by the plaintiff, and the presumption of validity of these patents remains in full force and effect.

29. Defendant has presented no evidence to satisfy the burden of proof required to establish abandonment of the inventions disclosed and claimed in the '498, '882 and '883 patents, under 35 U.S.C. § 102(c), and the presumption of validity established by the issuance of said patents has not been overcome.

30. The specification and claims of each of the '498, '882 and '883 patents fully comply with the requirements of 35 U.S.C. § 112 as to the form and content thereof.

31. The burden of proof rests upon the party asserting the defense of laches. Briggs v. M & J Diesel Loc. Filter Corp., 228 F.Supp. 26, 62 (N.D.Ill. 1964), aff'd 342 F.2d 573 (7th Cir. 1965). Defendant has not satisfied the burden of proof required to establish this defense, and plaintiff is, therefore, not estopped to enforce the patents in suit.

32. Defendant has presented no evidence to satisfy the burden of proof required to establish that plaintiff has not fully complied with the requirements of 35 U.S.C. §§ 184 and 185, as to the filing of patent applications in foreign countries corresponding to the U. S. patents No. 3,048,498, No. 3,169,882 and No. 3,-169,883, and the presumption of validity of these patents remains in full force and effect.

33. The burden of proof rests upon the party asserting a defense of misuse of a patent. Defendant has not satisfied the burden of proof required to establish such a defense. The patents in suit have not been rendered unenforceable due to any misuse thereof by the plaintiff.

34. Plaintiff is entitled to a permanent injunction restraining defendant against further contributory or direct infringement of United States Letters Patents No. 3,048,498, No. 3,169,882 and No. 3,169,883, or inducement of infringement thereof by others, as to the asserted claims thereof.

35. Plaintiff is further entitled to an award of costs with respect to the issues raised by defendant's challenge to the validity of United States Letters Patents No. 3,048,498, No. 3,169,882 and No. 3,-169,883, and by defendant's infringement of said patents, and plaintiff is entitled to a hearing by this Court to determine the amount of such costs.

36. Plaintiff is entitled to an accounting by this Court to determine the amount and extent of damages, and the cause should be continued as to the accounting issues pursuant to Rule 42 of the Federal Rules of Civil Procedure.